LA IGLESIA CATÓLICA, APOSTÓLICA Y ROMANA EN PUERTO RICO, DIÓCESIS DE SAN JUAN, recurrente, *v.* REGISTRADOR DE LA PROPIEDAD, SECCIÓN TERCERA DE SAN JUAN, recurrido.

*Número:* G-62-19      *Resuelto:* 8 de octubre de 1968

---

512

*Heriberto Torres Solá,* abogado de la recurrente. El Registrador recurrido compareció por escrito.

Sala Segunda integrada por el Juez Asociado Señor Hernández Matos como Presidente de Sala y los Jueces Asociados Señores Santana Becerra, Dávila y Torres Rigual.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

La Iglesia Católica recurrente era dueña, por donación que le hizo Long Construction Corporation en 1953, de una parcela de terreno con cabida de 3,636.22 metros cuadrados, situada en la urbanización "Caparra Heights Extension" del barrio Monacillos de San Juan. La inscribió a su nombre en el Registro de la Propiedad, sujeta a servidumbre constituida a favor de la Autoridad de las Fuentes Fluviales y a ciertas condiciones restrictivas sobre edificaciones.

El 20 de diciembre de 1955 la Iglesia Católica y la asociación para fines no pecuniarios denominada "The Order of Friars Minor of the Province of the Most Holy Name", domiciliada en la ciudad de Nueva York, otorgaron una escritura pública mediante la cual aquélla transmitió a dicha asociación la indicada parcela con arreglo a las siguientes estipulaciones:

"............................................ PRIMERA: ...........................................
......La Iglesia Católica, Apostólica y Romana en Puerto Rico, Diócesis de San Juan, por conducto de su Ilustrísimo Obispo Monseñor James P. Davis, vende a favor de "The Order of Friars Minor of the Province of the Most Holy Name", la finca urbana que por extensa se ha descrito en el párrafo primero que antecede, trasmitiéndosela a la compradora con todos cuantos usos, derechos, servidumbres y pertenencias le son inherentes, y sirviéndole este título en señal de posesión obligándose a la evicción y saneamiento..............................................
............................................ SEGUNDA: ...........................................
......Se efectúa esta venta por el precio de UN DOLAR que la

vendedora confiesa tener recibido de la compradora con anterioridad a este acto, y por otras consideraciones de incalculables valores religiosos, teniéndose en cuenta además, la inversión de unos SETENTA Y CINCO MIL DOLARES que The Order of Friars Minor of the Province of the Most Holy Name, ha de efectuar sobre el terreno aquí cedido, en la construcción de una Iglesia, Casa Parroquial o residencial, escuela y dependencias. ............................................................................................

......................................... TERCERA: ........................................
......Con el objeto de cooperar con la mencionada institución religiosa adquirente, la Iglesia Católica cede la mencionada parcela de terreno de manera que se pueda dotar a la comunidad de Caparra Heights Extension de facilidades religiosas y educativas y específicamente para dotarla de una Iglesia.....................

......................................... CUARTA: ........................................
......Esta venta se efectúa sin más limitaciones que la arriba expresada servidumbre a favor de Autoridad de Fuentes Fluviales de Puerto Rico y condiciones restrictivas sobre edificaciones actuales o futuras que imponga la Junta de Planificación; valorándose el terreno a todos los fines legales pertinentes en la cantidad de DIEZ Y OCHO MIL CIENTO OCHENTA Y UN DOLARES CON DIEZ CENTAVOS. ...................................

......................................... QUINTA: ........................................
......La compradora se obliga para con la Iglesia Católica, Apostólica y Romana en Puerto Rico, Diócesis de San Juan, a no ceder, enajenar, vender o gravar de modo alguno, arrendar ni ceder el uso ni el usufructo del terreno y lo que se construya sobre el mismo, a entidad o persona alguna, que no sea la Iglesia Católica, Apostólica y Romana en Puerto Rico, Diócesis de San Juan; y en el caso de que dicha entidad tenga que ausentarse o retirarse definitivamente de la isla, viene obligada a vender a la Iglesia Católica, Apostólica y Romana en Puerto Rico, Diócesis de San Juan, la parcela descrita anteriormente por el mismo valor de UN DOLAR en que compran de la Iglesia, y por UN DOLAR además, que se fija de común acuerdo, como precio por toda construcción que se haya edificado o se edifique sobre la parcela." ..................................................

La nueva titular de la parcela construyó sobre ella dos edificios de concreto, uno de dos plantas, nombrado "Colegio

Mother Cabrini" y el otro, de una planta, denominado "Iglesia Mother Cabrini".

El título de adquisición del 1955 fue presentado para su inscripción en el Registro de la Propiedad el 22 de mayo de 1961. En esa misma fecha también se presentó una hipoteca constituida por la asociación adquirente, con la aprobación de la Iglesia Católica, en garantía del pago de un préstamo ascendente a $90,000.00, sobre las parcelas y sus edificaciones, a favor de la Jefferson Standard Life Insurance Co.

La escritura de adquisición motivó la inscripción tercera de la finca, practicada el 22 de octubre de 1962. Este asiento registral, en lo pertinente, es como sigue:

"La Iglesia Católica Apostólica Romana, Diócesis de San Juan es dueña de esta finca según resulta de la inscripción segunda y representado por su Ilustrísimo, Monseñor James P. Davis, Obispo de San Juan, mayor de edad, célibe de estado y vecino de esta capital la vende a favor de The Order of Friars Minor of the Province of the Most Holy Name; asociación constituída y organizada para fines no pecuniarios conforme a las leyes del Estado de Nueva York, Registrada en el Departamento de Estado del Estado Libre Asociado de Puerto Rico, representada por el Reverendo Bernardino Ward, O.F.M., mayor de edad, célibe, de esta ciudad, por el precio de un dólar, recibido con anterioridad y por otras consideraciones de incalculables valores religiosos, teniéndose en cuenta además, la inversión de unos setenta y cinco mil dólares que la adquirente ha de efectuar sobre el terreno cedido, en la construcción de una Iglesia, casa Parroquial o residencial, escuela y dependencias y con el objeto de cooperar con la mencionada institución religiosa adquirente de manera que se pueda dotar a la comunidad de Caparra Heights Extension de facilidades religiosas y educativas y específicamente de una Iglesia; valorándose el terreno a todos los fines legales en dieciocho mil ciento ochenta y un dólares con diez centavos. La compradora se obliga para con la Iglesia Católica, Apostólica y Romana en Puerto Rico, Diócesis de San Juan, a no ceder, enajenar, vender o gravar de modo alguno, arrendar ni ceder el uso ni el usufructo del terreno y lo que se construya sobre el mismo, a entidad o persona alguna, que no sea la Iglesia Católica, Apos-

tólica y Romana en Puerto Rico, Diócesis de San Juan; y en caso de que dicha entidad tenga que ausentarse o retirarse definitivamente de la isla, viene obligada a vender a la Iglesia Católica, Apostólica y Romana en Puerto Rico, Diócesis de San Juan, la parcela descrita por el mismo valor de un dólar en que compran de la iglesia, y por un dólar además que se fija de común acuerdo, como precio por toda construcción que se haya edificado o se edifique sobre dicha parcela. En su Virtud, inscribo a favor de The Order of Friars Minor of the Province of the Most Holy Name, la finca de este número por título de compra, denegándose la consignación de la cláusula aquella del párrafo quinto de la escritura, con arreglo a la cual la compradora se obliga a no ceder, enajenar, vender o gravar de modo alguno, arrendar ni ceder el uso ni el usufructo del terreno o lo que se construya sobre el mismo, que no sea la Iglesia Católica Apostólica y Romana de Puerto Rico, por ser dicha condición inoficiosa y tomo en su lugar anotación preventiva por ciento veinte días a favor de dicha Iglesia Católica Apostólica y Romana de Puerto Rico."

La nota de despacho, puesta al pie del título inscrito, dice:

"Inscrito este documento con vista de otros, habiéndose denegado en cuanto a la consignación de la *cláusula del párrafo quinto* por ser inoficiosa al folio 96 del tomo 503 de Monacillos, finca Núm. 18,272 (antes 13,309) Ins. 3ra. Afecta a condiciones restrictivas de edificación y a servidumbre a favor de Fuentes Fluviales de P.R." (Énfasis suplido.)

Contra esa negativa interpuso la Iglesia Católica el presente recurso gubernativo. Sostiene que debe revocarse la nota recurrida y ordenarse la inscripción de la cláusula QUINTA, porque (1) del contenido total del documento debió tomarse razón en el Registro "en concomitancia con la intención de las partes, fines y propósitos del contrato", ya que la naturaleza y efectos jurídicos de esa cláusula no podían ser calificados considerándola aisladamente; (2) que tal cláusula no era un pacto inoficioso, sino una condición necesaria y (3) que se trata o bien de una especie de com-

praventa con pacto de retro o de una donación con condición resolutoria en derecho.

Por su parte el Registrador pide se confirme su nota porque (a) la cláusula quinta es un pacto inoficioso que limita y cercena el derecho de propiedad que contraviene los Arts. 280 del Código Civil y 107 (4) de nuestra Ley Hipotecaria y que la misma "a lo más que se acerca y configura es a un vínculo obligacional del llamado derecho de opción con rango puramente personal, sin trascendencia real alguna no inscribible."

## I

En primer lugar queremos hacer la siguiente observación:

La cláusula QUINTA, inserta a la página —, está compuesta por dos pactos. Por el primero de ellos la institución adquirente The Order of Friars Minor of the Province of the Most Holy Name *se obliga para con la Iglesia Católica* a no ceder, enajenar, vender o gravar de modo alguno, arrendar ni *ceder el uso ni el usufructo del terreno y lo que se construya sobre el mismo*, a entidad o persona alguna, *que no sea la Iglesia Católica*, Apostólica y Romana, Diócesis de San Juan.

Por el segundo, la nueva titular, "en caso de que tenga que ausentarse o retirarse definitivamente de la isla, viene obligada a vender a la Iglesia . . . la parcela descrita . . . por el valor de UN DOLAR, en que compran . . . y por UN DOLAR además, que se fija como precio por toda construcción que se haya edificado o se edifique sobre la parcela."

De la transcrita inscripción tercera, practicada en el Registro, claramente resulta que, en primer término, *ambos* pactos se hicieron figurar en ella, aunque luego, en el mismo, asiento, se consigna:

". . . denegándose la consignación de la *cláusula aquella del párrafo quinto* de la escritura, con arreglo a la cual se obliga a

no ceder, enajenar, vender o gravar en modo alguno, arrendar ni ceder el uso ni el usufructo del terreno o lo que se construya sobre el mismo, que no sea la Iglesia Católica . . . *por ser dicha condición* inoficiosa y tomo en su lugar anotación preventiva por ciento veinte días a favor de dicha Iglesia . . . ." (Énfasis nuestro.)

Al limitarse la negativa al primer pacto, el segundo quedó definitivamente consignado en la inscripción tercera del inmueble aunque la nota de despacho no lo hace constar claramente así. En la misma se hace constar que se había denegado la inscripción del documento ". . . en cuanto a la consignación de la *cláusula del párrafo quinto* por ser inoficiosa al folio 96 . . ." dándose la impresión de que, en su totalidad, la cláusula quinta fue rechazada.

## II

Por lo observado, el punto central a resolver en este recurso quedó limitado a si es inscribible o no lo es, el primer pacto de la cláusula QUINTA, que quedó sin protección registral, y por el cual la compradora se obliga a no disponer de la parcela y sus edificaciones a entidad o persona alguna que no sea la Iglesia Católica.

◼ El Registrador en su nota simplemente indicó que denegaba la inscripción de tal obligación por "ser inoficiosa". Con ello se apartó del mandato legal de exponer "al pie del documento, clara y concisamente, los motivos legales de su negativa." Es en su memorándum que expone la siguiente y principal razón para sostener su negativa: La cláusula quinta, en su primer pacto denegado, es nula e ineficaz, porque constituye una típica y verdadera prohibición de enajenar o disponer, que hace imposible en derecho su pase registral.

Apoyando ese enfoque del problema, entre otras cosas, nos dice en su interesante memorándum:

"Y entramos de lleno en la médula de este caso, esto es, si dado los preceptos que contienen las secciones 1111 del Tí-

tulo 31, y 203 del Título 30 L.P.R.A. (Artículos 280 del Código Civil y 107 de la Ley Hipotecaria) es posible darle paso a una cláusula que limite y cercene el derecho de propiedad.

. . . . . . . .

La Resolución de la Dirección General de los Registros de 9 de junio de 1914, declara, que si el pacto de constituir otro gravamen hipotecario es nulo de acuerdo con el Art. 107 de la Ley Hipotecaria, con más razón ha de entenderse condenado con igual ineficacia el pacto de no enajenar por ser mucho más limitativo (Jurisprudencia Registral 1914—Roca Sastre y Molina Juyol Tomo IV, página 1060).

La tendencia moderna es más radical aún en cuanto a la oposición a la admisión de cláusulas como la denegada y que es objeto de este recurso.

La Legislación y la jurisprudencia modernas son cada vez más opuestas a la admisión con efectos hipotecarios, ni siquiera revestidas del carácter de condiciones, de las prohibiciones contractuales del poder dispositivo del dueño de los inmuebles, dejando a salvo los efectos civiles derivados del incumplimiento de lo pactado . . . . Resolución del 25 de noviembre de 1935 de la Dirección General de los Registros—Jurisprudencia Registral—Roca Sastre y Molina Juyol—Tomo VII—Página 715—porque 'tales limitaciones, directa o indirectamente establecidas, disminuyen o extinguen la posibilidad de que el dueño de los bienes constituya ulteriores hipotecas, amplían excesivamente las atribuciones del acreedor, pretenden crear situaciones jurídicas que rebasan la medida racional y legalmente determinada, desvirtúan las garantías que las leyes adjetivas establecen a favor de los interesados y, en definitiva, son contrarias al fomento del crédito territorial, base fundamental de nuestro sistema hipotecario . . . .' Resolución del 25 de noviembre de 1935, Supra. (la misma página.)"

Ese enfoque del problema sigue una de las vertientes— la obligacional—de la controversia aún existente entre los hipotecaristas españoles sobre la cuestión, muchos de los cuales atribuyen eficacia real a las prohibiciones típicas y verdaderas de disponer y propugnan su acceso registral.

■ Se ha definido la prohibición de disponer o enajenar como imposibilidad de trasmitir o de enajenar, a título one-

roso o gratuito, una cosa o derecho, en virtud de pacto, precepto legal o de decisión judicial o administrativa. También como la situación resultante de manifestaciones de voluntad hechas en negocio jurídico por la que se niega a alguien la facultad dispositiva sobre bienes o derechos normalmente enajenables. Por su origen, amplitud, duración, caracteres de prestación y momento en que producen eficacia, se han clasificado en (1) voluntarias o convencionales, legales, judiciales o administrativas; (2) absolutas o relativas; (3) indefinidas, perpetuas y temporales; (4) onerosas y lucrativas; (5) inter vivos y *mortis causa*. (¹)

Es cierto que, principalmente contra las prohibiciones de disponer convencionales absolutas y perpetuas entre otras cosas, se ha dicho: producen la indefinida amortización de la propiedad; adulteran y desnaturalizan el derecho de dominio privándolo de uno de sus más esenciales elementos o facultades; entorpecen el comercio jurídico; truncan violentamente el historial hipotecario de las fincas, cerrando el Registro a toda futura transacción sobre las mismas; pueden crear incertidumbre en la honestidad del deudor u obligado; constituyen un suicidio del propio *ius disponendi* y crean situaciones ambiguas y confusas; se han de considerar civilmente como pacto ilícito por ser contrario a la moral y al orden público y se oponen al principio de la libertad contractual; retiran a la voluntad humana su potencia engendradora; que, en las indeterminadas, tienen el valor negativo de una limitación sin titular, privando de su condición de transferible a derechos legalmente declarados transferibles; que, con las determinadas, se reduce el ámbito de las personas con quienes se puede contratar; que permiten al

---

(¹) Véanse Jerónimo González Martínez: *Estudios de Derecho Hipotecario y Derecho Civil*, Tomo I, 1948, Madrid, págs. 486 y sigtes.; Roca Sastre: *Derecho Hipotecario*, 5ta. ed., 1954, Barcelona, págs. 365 y 366; De Casso Romero: *Derecho Hipotecario*, 4ta. ed., 1951, Madrid, págs. 387 y 388.

deudor de mala fe escamotear su patrimonio; limitan de modo directo el crédito territorial y constituyen una traba a la circulación de la riqueza, ejerciendo nefanda influencia en la vinculación territorial; repugnan al Derecho y provocan en los derechos reales una situación patológica, parasitaria y anormal; resultan una auto-aniquilación del dominio y un ejercicio abusivo del derecho de disposición.

En España, con la reforma de 1944-46 el problema hipotecario que presentaban las prohibiciones de disponer en negocios jurídicos que no fueran testamentos o donaciones, quedó legislativamente resuelto al disponerse en el Art. 27 de la Ley que tales prohibiciones "no tendrán acceso al Registro". A las derivadas de negocios onerosos se les redujo a una mera existencia civil al nivel personal obligacional, sin perjuicio de que se asegurara su cumplimiento mediante hipoteca o cualquier otra forma de garantía real. Entonces, con arreglo al Art. 57 del Reglamento se inscribirán en un solo asiento el acto o contrato que las contenga y la hipoteca o la otra garantía real que se constituya y se hará constar que se deniega la inscripción de la prohibición de disponer.

Esa reforma legislativa no satisfizo a la crítica jurídica española. Véanse: Lo escrito sobre este tema en la obra *Derecho Hipotecario*, de Roca Sastre, págs. 394 y sigtes., Tomo II, 5ta. ed.; *Estudio de las Prohibiciones de Disponer* de Enrique Alpañés, Tomo 188, 1950, Revista General de Legislación y Jurisprudencia, págs. 79 y sigtes.; *Comentarios a la Ley de Reforma Hipotecaria*, de Ramón de la Rica y Arenal, Madrid, 1945, págs. 184 y 186.

De la Rica, en esta página 186 comenta:

"Quizá ésta haya dado un paso más allá del justo medio al prohibir, como lo hace, en absoluto el acceso al Registro de las prohibiciones de disponer contractuales, olvidando la función de garantía y de protección de intereses legítimos que pueden desempeñar con manifiesta utilidad en ciertas ocasiones, máxime

hoy, en que todo lo obligacional ha sido fulminado del ámbito del Registro. Podría haberse moderado el rigor de la ley admitiendo la inscripción de esta clase de prohibiciones dentro de estrictos límites: plazo breve, no superior a diez años, por ejemplo, y finalidad racional y jurídica, en cuanto tengan por fin favorecer a titulares determinados o tutelar posiciones jurídicas de terceras personas."

Roca Sastre, a su vez, en el citado examen informativo crítico opinó lo siguiente:

"c) En cuanto al art. 27 hay que criticar su excesivo radicalismo al expulsar del Registro todas las prohibiciones de disponer establecidas en actos a título oneroso, sin exceptuar ciertos casos concretos en los cuales la prohibición puede prestar señalados servicios.

Ya hemos indicado la utilidad de la prohibición de disponer como resorte de seguridad de la obligación de pagar el precio aplazado en la compraventa, pues aparte de su temporalidad y de lo justificado de la precaución, resulta absurdo que no se pueda hacer, por vía de prohibición dispositiva, lo que puede conseguirse por medio de una condición suspensiva o resolutoria, más teniendo en cuenta que no es cosa tan extraña el que se obstaculice la venta de una cosa comprada con precio aún debido. Como señala la Rica, quizá la Ley Hipotecaria actual haya dado un paso más allá del justo medio, al prohibir, como lo hace, en absoluto, el acceso al Registro de las prohibiciones de disponer contractuales, olvidando la función de garantía y de protección de intereses legítimos que pudieran desempeñar con manifiesta utilidad en ciertas ocasiones.

Esta repulsa absoluta o total, del Registro, de las prohibiciones de disponer establecidas en actos a título oneroso, constituye una medida que no se sabe exactamente si responde a un motivo de ilicitud o de intrascendencia real. Si obedece a esta segunda idea, creemos que esto es exagerar las cosas, pues no cabe duda que los particulares pueden alterar directamente el *ius disponendi*, limitando realmente su ejercicio, dentro de determinados límites, en vez de adoptar un mero compromiso obligacional. Si obedece a la primera idea, o sea, al criterio de ilicitud, por estimar que dichas prohibiciones de disponer, por la amortización que provocan en la propiedad, repugnan al Derecho, entonces habrá que objetarse que quizá dicha regla gene-

ral de ilicitud es demasiado absoluta, pues aparte de que existen casos justificados de excepción, no hay que olvidar que, fuera de los actos onerosos, bien se reconoce plena validez a las prohibiciones de disponer. En rigor, el artículo 27 de la Ley se inspira más bien en el criterio de la intrascendencia real de estas prohibiciones, por lo cual es más criticable.

La Dirección General de los Registros había recogido la tendencia que distingue, en las prohibiciones convencionales de disponer, los efectos reales de los obligacionales, negando aquéllos y afirmando éstos, por entender que en el orden obligacional priva el principio de la autonomía de la voluntad (art. 1.255 del Código civil), a diferencia del campo de los derechos reales en que domina un criterio contrario a la amortización de la propiedad. Esta doctrina no enfoca el problema desde el punto de *licitud* de las prohibiciones de disponer paccionadas, sino en el de su *eficacia,* reconociendo ésta plenamente, pero tan sólo en el orden obligacional, o sea atribuyéndoles la virtualidad exclusiva de un mero compromiso de no disponer, cuya infracción hace nacer una obligación de indemnizar daños y perjuicios; en cambio, les niega efectos obstativos o de cierre registral y originadores de la nulidad del acto dispositivo otorgado en contra de la prohibición.

Afirma Franco Negro que la eficacia de las prohibiciones convencionales de disponer ha de ser meramente obligatoria, ya que los particulares no pueden establecer una indisponibilidad con trascendencia *erga omnes* atributiva de eficacia real a un vínculo que, por su naturaleza, es eminentemente personal. Jerónimo González sustenta idéntica opinión, por considerar que en el campo de los derechos reales el papel de la voluntad es menos importante de lo que piensan los profanos, pues son en cierto modo moneda acuñada, cuyo peso no debe dejarse al arbitrio de los contratantes. En cambio, el art. 1.255 del Código civil no se opone al pacto que prohibiera al comprador enajenar la cosa adquirida; la obligación contractual puede ser válida y las responsabilidades por su incumplimiento, exigibles.

Creemos que el problema acerca del valor de las prohibiciones convencionales de disponer es preferible centrarlo más bien en el campo de su licitud que en el de la distinción entre su eficacia real y obligacional. Si tales prohibiciones se consideran ilícitas, por reprobarlas el Derecho atendidas las exigencias de la organización de la propiedad, deben rechazarse

como tales, y, por tanto, considerarlas ininscribibles en el Registro de la Propiedad; si se estiman lícitas, debe permitirse que los particulares las configuren—al igual que otras figuras jurídicas—o como mero compromiso obligacional de no disponer, en cuyo caso no deben ser naturalmente registrables, o como modificación interna o del contenido del dominio o derecho real, por afectar al ejercicio del *ius disponendi,* en cuyo supuesto deben ser admitidas y consideradas registrables, sin perjuicio de imponerles ciertos requisitos de temporalidad, finalidad apreciable y ventaja para alguien."

De Casso Romero, en la pág. 391 de su mencionado tratado, comenta:

"CRÍTICA. Como hemos dicho no parece justificado que por sistema se rechace la inscripción de las prohibiciones voluntarias o *convencionales* de disponer, *onerosas,* inter vivos; porque, aparte de que hay casos en los cuales parecería su inscripción muy natural y aún obligada—como cuando se aplace el pago del precio en la compraventa—, no hay motivo alguno para reputarlas *ilícitas,* ni para negarles trascendencia real. Ya que, no son ilícitas, al no condenarlas ninguna norma de Derecho natural, ni positivo; y, por el contrario, como ya hemos apuntado, hoy se reacciona universalmente contra la obstinada idea 'desamortizadora' del pasado siglo, propugnándose, para muchas finalidades jurídicas y económicas, el retorno a la vinculación familiar y asociativa, tan insustituíble, según la experiencia histórica. Y en cuanto a la *intranscendencia real* de tales prohibiciones, es arbitraria, sobre todo después de admitir la inscripción de las a título *gratuito* y de las *mortis causa;* y, además, porque si no son ilícitas, no puede privarse al titular de su facultad de imponer límites al sucesor en el dominio, también por acto inter vivos *oneroso,* ni de que exija que se haga así constar en el Registro *erga omnes.*"

Por lo que hemos visto, el veto registral del nuevo Art. 27 en la Ley Hipotecaria española no desterró en absoluto de la vida del Derecho, a todas las prohibiciones de disponer impuestas en negocios onerosos. La controversia en torno a ellas sigue abierta. Influenciados por la obra del maestro Jerónimo González, gran defensor del criterio de *numerus*

*clausus* en materia registral, hay autores que continúan considerando a todas como meros pactos o compromisos obligacionales, sin efectividad hipotecaria contra terceros; pero hay otros que, con ciertas excepciones, las reconocen como verdaderos derechos reales inscribibles, por dar lugar a situaciones de sujeción con inherencia a la cosa y con eficacia *erga omnes.* (²)

Existe un marcado contraste conceptual entre la jurisprudencia del Tribunal Supremo de España y la de la Dirección General de los Registros sobre el sistema de *numerus apertus.* Como apunta Lacruz Berdejo, mientras ésta se muestra, en el análisis de los supuestos concretos, muy restrictiva en cuanto a su caracterización como derecho real o modalidad con eficacia *erga omnes* (da de ejemplo la Resolución de 6 de julio de 1949, que consideró como obligación personal una condición de un contrato de compraventa en el que se estipuló que el edificio o edificios que se construyeran habrían de ser destinados a Seminario diocesano), aquél favorece la interpretación amplia del *numerus apertus,* citando la Sentencia del 25 de junio de 1945, en que se hizo notar que "la concesión de efectos reales y el acceso al Registro de la Propiedad de un pacto de la indicada naturaleza, no pugnan en nuestra legislación con preceptos de carácter prohibitivo o normas de orden público que lo impidan; y si la licitud del pacto de no enajenar ni gravar la finca de

---

(²) Entre los primeros encontramos, desde luego, a renombrados epígonos del maestro Jerónimo González: Sanz en sus *Comentarios a la Nueva Ley Hipotecaria,* pág. 186, 2da. ed.; Ventura-Traveset en *La Prohibición de Disponer en la Práctica Jurídica,* publicada por la Academia Valenciana de Jurisprudencia y Legislación, Cuaderno Núm. 14 y Francisco T. Talón Martínez: *Prohibiciones Convencionales de Disponer,* Revista Jurídica de Cataluña, Año LIII, Vol. LXXI, págs. 46-62. Entre los segundos están Roca Sastre, Alpañés, Joaquín Sapena (véase su artículo *Sobre la Prohibición de Ceder el Crédito Hipotecario,* Revista Crítica de Derecho Inmobiliario, Tomo 33, 1957, págs. 345 y sigtes.); De Casso Romero, Vallet de Goytisolo, *Determinación de los Derechos Susceptibles de Trascendencia Registral,* Revista Crítica de Derecho Inmobiliario, 1961, pág. 186.

que se trata es indudable en el caso del pleito, y si, con arreglo al art. 14 del Reglamento Hipotecario todo cuanto significa una restricción de la facultad de disponer de un inmueble tiene transcendencia real inmediata, no puede menos de ser estimado el recurso en cuanto sostiene que es inscribible aquél en el Registro de la Propiedad."

## III

Las prohibiciones voluntarias de enajenar o disponer, en sus aspectos y repercusiones registrales, no han sido especialmente reguladas en Puerto Rico. (3) Nuestro Código Civil no se ocupa de ellas en forma unitaria, pero sí, en forma desperdigada, al tratar de la donación, de la institución de herederos y de otras materias. (4)

---

(3) El proyecto de ley para establecer el Código Hipotecario de Puerto Rico, presentado el 9 de marzo de 1967 (P. de la C. 782 y P. del S. 604), inspirándose en la legislación inmobiliaria alemana y en los Arts. 26 y 27 de la Ley Hipotecaria española y 57 de su Reglamento, propuso la aprobación del siguiente artículo sobre la materia:

"Art. 153. [Prohibición de enajenar]

"La facultad de disponer de un derecho real enajenable podrá quedar prohibida, excluida o limitada por negocio jurídico oneroso o lucrativo, siempre que la legislación vigente o alguna resolución judicial lo autorice. Las prohibiciones, exclusiones o limitaciones de tal facultad, pactadas voluntariamente en negocio jurídico oneroso o lucrativo entre particulares, no tendrán acceso al Registro, sin perjuicio de que el importe de los daños que pudiera realmente causar el incumplimiento de la obligación personal contraída se asegure, hasta el límite máximo numerario en que previamente las partes los valoren, mediante hipoteca o cualquier otra forma de garantía real. En este caso se inscribirá en un solo asiento el negocio jurídico oneroso o lucrativo y la hipoteca o garantía real que se constituya, denegándose la inscripción de la obligación personal correspondiente."

(4) Véanse sus Arts. 578, 589, 714 (2), 720, 721, 741, 1267, 1268, 1272, 1347, 1348, 1435, 1438 y 1758. Desde luego las establecidas por Ley gozan de una publicidad que supera a la que el Registro puede proporcionar, aunque no consten o se reflejen allí. Las judiciales o administrativas, que ejercen una función cautelar, deben anotarse en el Registro para perjudicar a terceros, pues de por sí no gozan de publicidad; aunque los bienes y derechos anotados podrán ser enajenados o gravados, sin perjuicio del derecho o de la persona a cuyo favor se haya hecho la anotación conforme lo dispone el Art. 71 de la Ley Hipotecaria.

■ Los pactos de no enajenar en negocios jurídicos onerosos son lícitos, por estar amparados por el principio de la libertad de contratación, que, sujeto a determinadas limitaciones, consagra el Art. 1207 de nuestro Código Civil. Nuestra legislación hipotecaria, en general, no los proscribe. Cuando no son contrarios a las leyes, a la moral, ni al orden público, nada obsta para su acceso registral, en vista de lo dispuesto en los Arts. 2 (2) y 9 (2) de nuestra Ley Hipotecaria y 24, 27, 63 (7) y 75 (6) de su Reglamento. (5)

---

(5) "Ley Hipotecaria"

"ARTÍCULO 2.—En los Registros expresados en el artículo anterior se inscribirán:

" . . . . . . .

"2.—Los títulos en que se constituyan, reconozcan, modifiquen o extingan derechos de usufructo, uso, habitación, enfiteusis, hipotecas, censos, servidumbres y otros cualesquiera reales."

"ARTÍCULO 9.—Toda inscripción que se haga en el Registro expresará las circunstancias siguientes:

" . . . . . . .

"2.—La naturaleza, extensión, condiciones y cargas de cualquiera especie del derecho que se inscriba y su valor, si constase del título.'

"Reglamento Hipotecario"

"ARTÍCULO 24.—Serán inscribibles todos los bienes inmuebles y los derechos reales constituidos sobre los mismos, sin distinción alguna, ya pertenezcan a particulares, al Estado, a la provincia, al municipio o a corporaciones civiles o eclesiásticas."

"ARTÍCULO 27.—Conforme a lo dispuesto en los párrafos primero, segundo y tercero del artículo 2 de la ley, no sólo deberán inscribirse los títulos en que se constituyan, reconozcan, transmitan, modifiquen o extingan el dominio o los derechos reales que en dichos párrafos se mencionan, sino cualesquiera otros relativos a derechos de la misma índole, como adquisiciones de fincas pertenecientes a la mitad reservable de los mayorazgos, concesiones definitivas de minas, caminos de hierro, obras públicas, aguas, pastos y otros semejantes, adjudicaciones en pago de deudas procedentes de concurso de acreedores o juicio de quiebra, concesiones de tierras realengas, el derecho de anticresis, el de retraer las fincas vendidas con pacto de retro, o bien cualquier acto o contrato legítimo que, sin tener nombre propio en derecho, modifique desde luego o en lo futuro alguna de las facultades del dominio sobre bienes inmuebles o derechos reales."

"ARTÍCULO 63.—Para dar a conocer con exactitud las fincas y los derechos que sean objeto de las inscripciones, ejecutarán los Registradores lo dispuesto en el artículo 9 de la ley, con sujeción a las reglas siguientes:

"Primera. . . . . . . . .

■ Para hacer posible la convivencia de la especie prohibiciones voluntarias de disponer en la familia de las limitaciones y restricciones a la libertad contractual en el ámbito inmobiliario registral, reglamentando sus condiciones en lo que tienen de útiles e impidiendo, en lo posible, sus efectos perjudiciales al tráfico de los derechos reales, es preciso arroparlas con una serie de ciertos caracteres que las completen, que, a juicio de los distinguidos hipotecaristas españoles Chico Ortiz y Bonilla Encina (⁶) se resumen así:

a) Las prohibiciones de disponer no se presumen, han de ser expresas.

b) Son de carácter excepcional y, por ello, llevan en sí la necesidad de ser interpretadas en forma estricta, aunque admiten la interpretación extensiva o el procedimiento analógico, según las nuevas doctrinas de la jurisprudencia.

c) No tienen carácter institucional, suponiendo esta nota la exclusión de la indisponibilidad de ciertas cosas y derechos, por ejemplo en los casos de los derechos de uso y habitación, aunque en ellos realmente se trata de casos de inexis-

---

"*Séptima*. Para dar a conocer la extensión y cargas del derecho que deba inscribirse, se hará mención circunstanciada y literal de todo lo que, según el título, limite el mismo derecho y las facultades del adquirente en provecho de otro, ya sea persona cierta, o ya indeterminada, así como los plazos en que venzan las obligaciones contraídas, si fueren de esta naturaleza las inscritas."

"Artículo 75.—La inscripción de cualquiera especie se extenderá por el orden siguiente:

"*Primero*.     .     .     .     .     .     .     .     .

"*Sexto*. Copia literal de las condiciones impuestas al adquirente o a sus sucesores que restrinjan de cualquier modo las facultades del dominio."

El Art. 264(2) de nuestro Código Civil, que procede del Art. 471 de Luisiana, define como inmuebles, por razón del objeto al cual se aplican, entre otras, "Cualquier derecho u obligación constituído sobre una propiedad inmueble". Este texto está a tono con nuestro sistema hipotecario del *numerus apertus*. Vallet de Goytisolo, opina en la *Revista Crítica de Derecho Inmobiliario*, 1961, pág. 175, que el criterio del *numerus clausus* de los derechos reales o de los derechos inscribibles será un sistema cómodo para los funcionarios, pero antijurídico en su esencia.

(⁶) Véase la reciente obra de ellos *Apuntes de Derecho Inmobiliario Registral*, pág. 579, 2da. ed., 1967, Madrid.

tencia de la facultad dispositiva, no de existencia de la prohibición.

d) Que la prohibición recaiga sobre el *ius disponendi* del derecho, no siendo prohibiciones de enajenar, en sentido técnico, las normas prohibitivas referentes al objeto del negocio (Arts. 1223 y sigtes. de nuestro Código Civil) o a su contenido (Arts. 1207, 1582, 1757, 1859, etc., de ese Código).

e) Las prohibiciones de disponer han de ser temporales, no perpetuas.

f) Deben responder a un interés jurídico, a una causa o razón justificada o finalidad apreciable.

g) No atribuyen derecho a otra persona. Con esta nota o carácter como esencial de la prohibición de disponer, se facilita en mucho la distinción de esta figura de otras marginales, como la sustitución fideicomisaria, la opción y el tanteo, las cláusulas de exclusiva de venta o compra, etc.

## IV

La problemática de los aspectos inmobiliarios registrales de las prohibiciones voluntarias de disponer ha ocupado pocas veces nuestra atención. El Registrador recurrido varias veces cita a *Van Syckel* v. *Registrador*, 3 D.P.R. 10, 2da. Ed. (Quiñones) (1899), y *Luiña* v. *Registrador*, 3 D.P.R. 18, 2da. Ed. (Quiñones) (1900), en apoyo de su posición.

En el primero de ellos se denegó la inscripción de un pacto de no enajenar una finca rústica, objeto de un contrato de arrendamiento por tiempo indeterminado, por el fundamento de no ser inscribible. Concurrimos con la calificación impugnada en vista de que se trataba de un pacto de no enajenar convenido para proteger al arrendatario contra posteriores compradores o arrendatarios de la finca, protección que era innecesaria y estaba de más, toda vez que al inscribirse el contrato quedaba protegido frente a terceros y porque tal pacto perjudicaba "sin necesidad al propietario".

En el sentido de ser innecesario e inútil allí como medida cautelar o protectora, calificamos el pacto de "gravamen inoficioso", puesto que no respondía a un interés jurídico, a una causa o razón justificada o finalidad apreciable y motivaba más perjuicios que beneficios.

Por igual razón, en el recurso de *Luiña*, confirmamos la negativa registral de un pacto de no enajenar una finca adjudicada en una partición de herencia con la obligación de satisfacer determinadas deudas del caudal hereditario, ya que al inscribirse tal adjudicación resultaba gravada la finca en garantía del pago de tales créditos y holgaba la imposición de otro gravamen con la misma finalidad.

En los casos de *Torres* v. *Registrador*, 27 D.P.R. 873, (Hernández) (1919), y *Llinás* v. *Registrador*, 33 D.P.R. 925, (Franco Soto) (1925), consideramos válidos e inscribibles dos contratos de compraventa, con cláusulas de reservarse el respectivo vendedor el dominio de la finca vendida hasta la total solución de su precio. Durante ese tiempo quedaba práctica y absolutamente privado el comprador respectivo de la facultad de disponer o enajenar la finca. La reserva del derecho dominical equivalía a una eficaz garantía del pago del precio acordado.

En *Pueblo* v. *Rodríguez Babilonia*, 51 D.P.R. 316 (Travieso) (1937) resolvimos que era constitucional la prohibición de hipotecar, impuesta por la Ley Núm. 53 de 1921, a los dueños de construcciones levantadas sobre solares de El Pueblo de Puerto Rico cedidos en usufructo de por vida. Entre otras cosas, a la pág. 321 del tomo citado, dijimos:

"Las restricciones impuestas por la ley y por la concesión del solar son, a nuestro juicio, justas, razonables y absolutamente necesarias para el éxito y para la existencia misma del Barrio Obrero de San Juan. Y la consecuencia de la declaración de nulidad que se solicita sería tal vez lanzar a la calle innumerables familias, que hoy viven en su propio hogar, convirtiendo el Barrio Obrero en campo de explotación de esas

mismas familias, obligadas a convertirse en inquilinos de los prestamistas.

El argumento de que la ley es inmoral porque permite la contratación de un préstamo y prohibe la hipoteca que lo garantiza, es por demás falaz."

Aunque se trataba allí de una prohibición legal, la eficacia y validez de la misma fue sostenida por ser justa, razonable y absolutamente necesaria para realizar el fin y propósito de la ley que la impuso y no era una medida legislativa arbitraria y caprichosa.

En *Estados Unidos de América* v. *Registrador*, 64 D.P.R. 982 (Snyder) (1945) el distinguido Registrador recurrido denegó la inscripción de una cláusula de un contrato de compraventa que imponía al comprador la obligación de no transferir, enajenar, hipotecar, arrendar o en cualquier otra forma disponer de la finca objeto de venta sin el consentimiento escrito del vendedor que lo era el gobierno de los Estados Unidos de América. También denegó la inscripción de ciertas condiciones resolutorias.

La Legislatura de Puerto Rico, por la Ley Núm. 163 de 1940, autorizó al gobierno de los Estado Unidos para imponer tales prohibiciones de enajenar y condiciones resolutorias en ciertas compraventas de bienes inmuebles que se proponía efectuar en Puerto Rico.

La negativa de inscripción se fundaba, respecto a la prohibición de no disponer, en que la misma era "contraria a las leyes y en especial a la letra y espíritu de los arts. 276 y 280 del Código Civil . . . ya que priva al comprador de la libre disposición de lo que adquiere como dueño, derecho que es base y fundamento del derecho de propiedad cuya inscripción se pide; . . . ."

No obstante el brillante esfuerzo realizado por el culto Registrador recurrido en su extenso alegato principal y en el de réplica, revocamos su negativa y ordenamos la inscripción del documento libre de defectos. A pesar de que

para así disponerlo nos fundamos en que la prohibición de disponer convenida había sido autorizada legislativamente y carecíamos de autoridad para enjuiciar la sabiduría legislativa al permitir tales pactos en negocios jurídicos onerosos entre el gobierno federal y ciudadanos particulares, justificamos también la medida legislativa envuelta diciendo, entre otras cosas: "Los Estados Unidos emprendieron en el 1935 un vasto programa para devolver a miles de ciudadanos de nuestra población rural, huérfanos de terrenos, sus pequeños predios. Pero la experiencia en Puerto Rico ha señalado una tendencia entre nuestros pequeños terratenientes de vender e hipotecar sus fincas a grandes entidades. Para evitar esa situación, se recabó la ayuda de la Legislatura insular, aprobándose la Ley Núm. 163."

En el caso de *E.L.A.* v. *Márquez*, 93 D.P.R. 393, (Rigau) (1966) confirmamos la sentencia recurrida por la cual se declaró nula cierta venta del usufructo perpetuo de una parcela de terreno, situado en el municipio de Luquillo, por ser contraria dicha transacción a la prohibición de enajenar bajo pena de nulidad absoluta, impuesta por el Art. 76 de la Ley de Tierras de Puerto Rico de 1941, según enmendado. En la opinión se sostiene la constitucionalidad de las limitaciones y restricciones que por razones de orden público pueden imponerse sobre el derecho de propiedad y se citan diversas ocasiones en que en Puerto Rico se han impuesto legalmente prohibiciones de disponer. Se resuelve que para que la legislación de esta naturaleza sea declarada inconstitucional es necesario que la misma "sea claramente arbitraria y que no guarde una relación razonable con el propósito público que persigue." (Pág. 403.)

■ Hemos hecho referencia a las anteriores decisiones en que se impugnó la validez de ciertas prohibiciones legales de disponer, porque, como hemos visto, en la determinación de la eficacia jurídica tanto de las legales como de las convencionales, predomina, junto con otros principios, el criterio

o norma de que ellas deben responder real y efectivamente, a un interés jurídico, a una causa o razón justificada, o a una finalidad apreciable en relación con el estatuto que la crea o permite, o con el negocio jurídico principal a cuyos elementos íntimos y constitutivos quedan asidas las prohiciones.

## V

Hay una serie de figuras que podrían inducir a posibles confusiones y deben ser excluidas de la calificación, consideración y tratamiento de verdaderas y típicas prohibiciones de disponer o enajenar. Chico Ortiz y Bonilla Encina, (⁷) a las págs. 583 y 588, nos dan el siguiente esquema tradicional de ellas:

"a) *Pactos obligacionales de no disponer.*—Nos dice SANZ que la prohibición de disponer afecta al derecho mismo, que aparece limitado por ella, mientras que la obligación de no disponer no afecta ni limita al derecho, ya que, no obstante la obligación, el derecho subsiste íntegro y el titular conserva la disposición del mismo, pues si dispone lo único que llega a producirse es el deber de indemnizar, derivado de la obligación contraída.

---

(⁷) Ambos juristas consideran que la reforma hipotecaria de 1944, respecto a las prohibiciones de disponer "adolecerá de incompleta mientras la legislación civil omita el conveniente desarrollo de una materia que, por ser extraña a esta Ley, no ha sido objeto de más detenido estudio." Pág. 589.

Conforme a esa reforma, la establecida en acto a título gratuito es la única prohibición de disponer que puede provocar un asiento de inscripción en que se hará mención circunstanciada de todo lo que limite las facultades del adquirente, copiándose literalmente las condiciones suspensivas, rescisorias, resolutorias y revocatorias, sin expresarse en ningún caso las estipulaciones, cláusulas o pactos que carezcan de trascendencia real. En cuanto a las onerosas, si vienen contenidas en un acto inscribible, según lo dispone el Art. 434 (2) del Reglamento español, "podrá inscribirse el título y denegarse la inscripción de la estipulación."

Sin embargo, la reforma española dejó vigentes artículos como el 2(4), 9(2), 42 de la Ley y los Arts. 7 y 51(6) del Reglamento, que no son opuestos al acceso registral de las prohibiciones voluntarias en negocios onerosos, ni a pactos con efectos reales análogos.

. Mientras la prohibición de disponer puede tener acceso al Registro la obligación de no disponer, por su interés puramente obligacional, queda excluida de la registración (art. 98 L.H. y 9 R.H.).

b) *Incapacidades y prohibiciones.*—Al comienzo apuntamos cómo en los negocios dispositivos eran precisos los requisitos de capacidad y el poder de disposición, según las tendencias jurídicas más modernas. Pues bien: la incapacidad no hace más que eliminar uno de dichos elementos: la capacidad. La prohibición elimina el poder de disposición, esto es, supone una ausencia de legitimación para disponer, si la prohibición afectase, no a la facultad dispositiva, sino al sujeto de ella titular. Roca Sastre, magistralmente, llega a la misma conclusión al decirnos que la prohibición y la incapacidad tienen de común que ambas consisten en una anormalidad o defecto que impide realizar válidamente un acto dispositivo; pero en la incapacidad esta anormalidad o defecto radica en la persona del titular de un derecho, mientras que en la prohibición radica en el derecho en sí. Las incapacidades son modos de ser o estar de las personas, teniendo un marcado carácter subjetivo (menor edad, demencia, imbecilidad, sordomudez, prodigalidad e interdicción civil), mientras que las prohibiciones son modos de ser o estar de los derechos, siendo de índole puramente objetiva por implicar una privación temporal o definitiva del ejercicio de la facultad dispositiva. Las incapacidades crean una anulabilidad del acto, mientras que las prohibiciones una nulidad absoluta, en la mayoría de los casos.

Otra posible distinción entre incapacidad y prohibición residen en que mientras el defecto de capacidad se suele suplir legalmente por medio de la representación legal o mediante licencias o autorizaciones, la prohibición es imposible de salvar hasta que finalice o desaparezca. Estas ideas son las que reflejan varias Resoluciones de la Dirección General, concretamente las de 22 de junio de 1943, 21 de abril de 1949 y 18 de abril de 1952, que insisten en la diferencia entre capacidad y prohibición, considerando que en el último caso no existe poder dispositivo y no puede suplirse como la falta de capacidad.

c) *Otras figuras afines.*—Dentro de este grupo, queremos incluir una serie de situaciones o figuras jurídicas que prácticamente ya han quedado perfiladas al estructurar los caracteres

que señalamos a las prohibiciones de disponer. Procederemos a una enumeración casi esquemática de las mismas:

—Inexistencia de poder de disposición.—Los casos más claros son los derechos de uso y habitación (art. 525 C.C.), los procedentes de depósito y comodato, así como todas aquellas cosas no aptas para sostener derechos transmisibles—según nos dice Moxó—cosas extra commercium, bienes públicos, patrimonios artísticos, etc.

—Existencia de un derecho a favor de otra persona.—A los casos de opción, tanteo y las cláusulas de exclusiva que apuntamos antes queremos ahora destacar el supuesto de la sustitución fideicomisaria. De la obligación de entrega que el artículo 783-2.º del Código Civil impone al fiduciario se dedujo doctrinal y jurisprudencialmente la existencia de una prohibición de disponer salvo que el testador dispusiere otra cosa o que consientan en la disposición todos los fideicomisarios (Ss. 29 enero 1916 y 3 noviembre 1932). Propiamente, la causa de la limitación temporal de la facultad dispositiva es la sujeción de los bienes a su restitución. ROCA SASTRE apunta que prohibición de disponer y sustitución son cosas distintas que, incluso en el mismo Código son tratadas independientemente, como lo demuestra el artículo 785 al referirse en el número primero a las sustituciones y en el segundo a las prohibiciones.

—Situaciones de pendencia y determinaciones accesorias.— Es MOXO RUANO el que afronta—seguido por CANOVAS COUTIÑO —la diferencia de estas situaciones de las prohibiciones de disponer. Incluye dentro del primer grupo todos aquellos que ENNECERUS, THUR y IHERING llamaron derechos en grado de desenvolvimiento, derechos de expectativa, derechos de espera y estados de indecisión, que DE CASTRO, en nuestro Derecho, agrupa bajo la denominación de situaciones interinas. Igualmente incluye en el primer grupo la nueva teoría de los derechos potestativos, de formación o modificación. Todas estas situaciones—dice—pueden llevar y llevan aparejados efectos de indisponibilidad, pero no son prohibiciones de disponer. Son estados de derecho en que les falta algún elemento formativo o final, constitutivo o decisorio, para su plenitud de existencia o de efectividad, pero que afectan al derecho por fuera, valga la frase, y no en su íntima estructura elemental."

# VI

A la luz de lo expuesto, es imposible compartir la calificación y tratamiento de verdadera prohibición de disponer que el recurrido dio al pacto por el cual la orden religiosa adquirente "se obliga . . . a no ceder, enajenar, vender o gravar de modo alguno . . . el uso ni el usufructo del terreno y lo que se construya sobre el mismo, a entidad o persona alguna, que no sea la Iglesia Católica . . . ."

Se trata de una obligación de no disponer respecto al uso y usufructo de la parcela y de lo que en ella dicha orden pudiera edificar. Considerado ese pacto aisladamente, sin enlace ni relación alguna con la finalidad, objetivos y propósitos esenciales del negocio jurídico principal inscrito, sí resulta el mismo una obligación puramente personal. Si con ella no quedó afectada ni limitada la libre facultad dispositiva del pleno dominio del inmueble, tendríamos, como apunta el recurrido, un vínculo obligacional con rango puramente personal, que sólo concedió a la trasmitente el derecho exclusivo de la futura adquisición del inmueble.

Empero, en el contrato no figura ese pacto separado de los demás. Las partes son instituciones religiosas; la Iglesia Católica al momento de formalizarse es, según el Registro, la titular de la parcela trasmitida; al contrato se le denomina "compraventa"; pero por la cláusula SEGUNDA se efectúa tal venta por (A) el precio de un dólar que la vendedora confiesa tener recibido de la compradora con anterioridad a este acto; (B) por otras consideraciones de incalculables valores religiosos, y (C) teniéndose en cuenta además, "la inversión de unos setenta y cinco mil dólares que The Order of Friars Minor of the Province of the Most Holy Name, ha de efectuar sobre el terreno *aquí cedido*, en la construcción de una Iglesia, Casa Parroquial o residencial, escuela y dependencias." (Énfasis nuestro.)

La parcela se cede según la cláusula TERCERA "de manera que se pueda dotar a la comunidad de Caparra Heights Extension de facilidades religiosas y educativas y específicamente para dotarla de una Iglesia." Así se reflejó lo esencial del pensamiento, intención común y propósito de las partes y alrededor de la estipulación TERCERA debe girar toda interpretación del contrato, porque ella es la base del mismo. Es el foco de luz que lo aclara.

La parcela se valora "a todos los fines legales pertinentes" en $18,181.10, es decir, a razón de $5.00 por metro cuadrado. Se pactó que la adquirente pagaría todos los gastos del otorgamiento e inscripción del documento.

Dentro de ese número de obligaciones y compromisos que asume la orden adquirente, es que se encuentran: la de no enajenar el uso y el usufructo a persona o entidad alguna que no sea en favor de la Iglesia Católica y el de vender a ésta, por $2.00 la parcela y sus edificaciones, en caso de que aquélla "tenga que ausentarse o retirarse definitivamente de la isla." Son medidas previsoras de cautela, conservación, garantía y seguridad para dar firmeza, continuidad y realización a la verdadera y única finalidad del contrato: "dotar a la comunidad de Caparra Heights Extension de facilidades religiosas y educativas y específicamente para dotarla de una Iglesia."

Difícilmente puede corresponder, en derecho positivo, el negocio jurídico realizado por ambas instituciones a la designación de "compraventa" que figura en el documento. Pero su validez es incuestionable. Los requisitos de consentimiento, objeto cierto y causa, concurren perfectamente.

El precio de un dólar, ya recibido, por una parcela valorada en más de $18,000.00, más otras consideraciones de incalculables valores religiosos, aleja toda idea o semejanza de una pura y típica venta. Obviamente no se trata de una transacción lucrativa o de fines pecuniarios. Fue la realiza-

ción del fin común espiritual, esencia institucional de ambas entidades contratantes, que las indujo a celebrarla.

Podríamos calificar ese conjunto de estipulaciones, cláusulas y pactos, como una donación modal, en que la beneficiaria se halla obligada a emplear toda la parcela donada en una determinada finalidad, realizando la siguiente prestación en favor de una comunidad específica ". . . dotar a la comunidad de Caparra Heights Extension de facilidades religiosas y educativas y específicamente para dotarla de una Iglesia."

En derecho, los efectos de esta obligación modal se producen siempre, independientemente de que la carga que el modo impone sea o no cumplido. Es un elemento accidental del contrato por el cual se designó el fin especial de la donación. Supone el modo una limitación de la voluntad, que obligó coactivamente a la orden religiosa donataria a realizar aquella prestación en beneficio de esa comunidad. Véanse Arts. 560(2), 561 y 589, Código Civil.

Si la titularidad de la parcela a The Order of Friars Minor of the Province of the Most Holy Name le fue conferida sujeta a la realización de un acto determinado, ese conjunto de cláusulas dio lugar a una sujeción con mayor o menor inherencia en la cosa donada y creó una situación jurídica protegible registralmente.

La obligación de no enajenar el uso o usufructo, repetimos, fue autoimpuesta para garantizar frente a terceros la continuidad en la prestación de facilidades y servicios educativos y religiosos a la mencionada comunidad. A ese "precio" fue que la Iglesia Católica "vendió" la parcela.

La transacción, considerada unitariamente, tiene matices de una simple trasmisión fiduciaria, o de la concesión gratuita del derecho de superficie con plazo indefinido, a que hacen alusión el Art. 1503 del Código Civil y el 107(5) de la Ley Hipotecaria. A veces su letra hace suponer que la

Iglesia Católica no deseaba realizar una plena y definitiva transferencia del dominio, sino una imperfecta, y por ello se adoptaron normas para la posible y futura reversión, por precio simbólico, tanto del suelo que ella "cede"—ese es el verbo que se usa en la cláusula TERCERA—como de sus construcciones, colegios de enseñanza, casa parroquial y templos.

El distinguido letrado de la recurrente, que fue el Notario que autorizó el documento, se inclina a considerar la transacción "como equivalente a una donación por la diferencia entre el valor del terreno y el precio que recibió" y sostiene que tal donación estaba sujeta a todas las condiciones impuestas mediante el título de su constitución y que "nadie discutiría que las donaciones condicionales están autorizadas por nuestra ley sustantiva." Esto es correcto, conforme lo prevenido en los Arts. 560, 561, 564, 568 y 589 del mencionado código. Igual ocurre con las disposiciones testamentarias. Arts. 710 a 720, Código Civil.

Como hemos dicho, al igual que a las prohibiciones legales de enajenar, la reforma hipotecaria española brindó acogida registral a las impuestas en negocios jurídicos a título gratuito. Por reconocérsele autoridad de ley a la voluntad del testador y dársele igual valor y respeto a la liberalidad del donante, o a la de cualquier trasmitente a título gratuito, en el Art. 26 de la Ley Hipotecaria se dispuso, en parte:

"Artículo 26.—Las prohibiciones de disponer o enajenar se harán constar en el Registro de la Propiedad y producirán efecto con arreglo a las siguientes normas:

Primera: .　　.　　.　　.　　.　　.　　.　　.

Tercera: Las impuestas por el testador o donante en acto o disposición de última voluntad, capitulaciones matrimoniales, serán inscribibles siempre que la legislación vigente reconozca su validez."

Por los servicios religiosos y educativos a prestarse se podría también considerar la transacción como donación remuneratoria.

## VII

Es cierto que nuestra Ley Hipotecaria en el Núm. 4 de su Art. 107, hace ineficaz el pacto de no volver a hipotecar bienes anteriormente hipotecados. Pero solo a tal pacto se limita su repudio de las prohibiciones de disponer, que por otro lado, y en términos generales, como ya hemos expresado, aquí tendrían acceso registral mientras no sean contrarias a la ley, a la moral y al orden público. Esa repulsa especial se justifica porque el pacto de no volver a hipotecar es, comúnmente, una exigencia obtenida por la precaria situación del deudor y puede ocasionar su ruina al verse imposibilitado de satisfacer sus deudas por no poder hipotecar por segunda y sucesivas veces su propiedad gravada.

Este cauteloso precepto de nuestra Ley Hipotecaria—que se conserva en el Núm. 3 del Art. 107 español—responde al objeto de no disminuir el crédito territorial. Pero del mismo se ha deducido erróneamente por partidarios del *numerus clausus* que constituye un infranqueable obstáculo jurídico general contra las prohibiciones voluntarias de disponer o enajenar.

Como dice Roca Sastre, Tomo IV, pág. 201, ed. de 1948, obra citada, el precepto proclama la posibilidad de que una misma cosa sea indefinidamente gravada con sucesivas hipotecas, y, además, establece la ineficacia del pacto de no volver a hipotecar una cosa, contenido en la constitución de una hipoteca anterior. También, a la pág. 204, nos dice que los legisladores de 1861 apoyaron técnicamente la declaración de ineficacia del pacto de no volver a hipotecar "en las razones que sirven de base a la doctrina de las prohibiciones de disponer: el no responder a un interés serio y legítimo." Sostiene también que el Art. 107 pasa en silencio el pacto

en que se prohibe enajenar, arrendar u otorgar actos inscribibles respecto de los bienes hipotecados, aunque la jurisprudencia española y el Art. 27 de la Ley extendieron la repulsa hipotecaria a estos actos.

Refiriéndose nuestro Art. 107 (4) exclusivamente a "los bienes anteriormente hipotecados con pacto de no volverlos a hipotecar," no podemos considerarlo de aplicación a todas las demás posibles relaciones jurídicas en que las prohibiciones de disponer sean impuestas en puros actos o contratos de enajenación, no en los de gravamen. El pacto a que se refiere el Art. 107 (4) no está presente en este recurso, y en un sistema inmobiliario registral de *numerus apertus* las excepciones no deben interpretarse extensivamente.

Refiriéndose a las condiciones del contrato, alega la recurrente que ellas dan "la modalidad y el concepto de una venta con pacto de retro, cuyo pacto consistió en que si la compradora deseaba ceder, enajenar, vender, etc. en algún momento, quedó obligada a vender exclusivamente a la Iglesia Católica."

No estamos conformes con esa conclusión. No podemos, ni tan siquiera remotamente, conceptuar la transacción como venta con pacto de retro, por los siguientes fundamentos.

A—Por constituir el pacto de retroventa una limitación o restricción a la facultad dispositiva del comprador—que solo adquiere un título resoluble, condicional imperfecto, eventual y en precario, durante la vigencia del pacto—debe constituirse en forma expresa, clara y específica, como toda estipulación de derechos excepcionales o de privilegio. [8]

_____

[8] El pacto de retroventa o retracto convencional, de orígenes bien remotos, también ha servido como medicina para sanar, pero mucho más como veneno para matar. Durante siglos sirvió de instrumento implacable de la codicia humana. Se mofó de los preceptos prohibiendo los pactos comisorios, de las normas contra la usura, de los principios de equidad y buena fe en la contratación privada de la propiedad inmueble.

Varios países hispanoamericanos han desterrado esa institución jurí-

En el caso de autos no se hizo así, ni aun el término retracto figura en la cláusula QUINTA.

■ B—El retracto convencional sólo procede respecto del contrato de compraventa. La transacción envuelta en este recurso no es realmente una compraventa, no obstante así denominarse. Prácticamente se haría imposible el "reembolsar al comprador el precio de la venta", a que se refiere el Art. 1407. Es una donación sujeta a condiciones que prácticamente son resolutorias, o de reversión gratuita a la luz de lo prevenido en el Art. 583 del Código Civil.

dica de sus códigos civiles, o han modificado sus consecuencias indeseables. Argentina, la prohibe en su Art. 1380, respecto a bienes muebles; en Cuba fue eliminada por orden militar de agosto de 1901, sin que hasta hoy la haya restablecido; Guatemala, en su Art. 1791, legisló: "Queda prohibido el pacto de retroventa"; Méjico, aunque concede cierto derecho de preferencia en futura venta, en su Art. 2302, dispuso: "Queda prohibida la venta con pacto de retroventa, así como la promesa de venta de un bien raíz que haya sido objeto de una compraventa entre los mismos contratantes"; Panamá, en su Art. 1277, también dispuso: "Es prohibido el pacto de retroventa".

Portugal, la prohibió en su Art. 1567 de su código anterior. Desconocemos si el código de julio de 1967 la prohibe.

Por otra parte, Chile, Art. 1884, Colombia, Art. 1942; Ecuador, Art. 1944; El Salvador, Art. 1682 y Perú, Art. 1448, prohiben su cesión voluntaria y trasmisión por herencia.

En Puerto Rico los retractos convencionales que encubrían verdaderos préstamos usurarios, sufrieron un rudo golpe en el año 1916, con la aprobación el 13 de abril de ese año de la Ley Núm. 47, para reprimir la usura, en cuya Sec. 1 se dispuso que toda venta de propiedad inmueble con pacto de retroventa se presumiría que constituye un contrato de préstamo por el montante del precio, con garantía hipotecaria en los casos de la no entrega de la posesión, pago de interés y precio enteramente inadecuado. Filipinas adoptó similar medida en su Art. 1602.

Venezuela, en el Art. 1546 de su Código de 1942, limitó el retracto legal al comunero y esto sólo "en el caso de que la cosa no pueda dividirse cómodamente o sin menoscabo."

A partir de la aprobación de la indicada Ley Núm. 47, podemos asegurar que la institución del retracto convencional cayó aquí en desuso. La gran mayoría de nuestras decisiones, desde *Lizardi* v. *Registrador*, 24 D.P.R. 863 (Hernández) (1917) hasta *Shivell* v. *Barber y Boscio*, 92 D.P.R. 400 (Rigau) (1965), unos 57 casos, versan sobre el retracto legal.

C—No se pactó duración alguna del llamado derecho de retro. Los cuatro años que fija el Art. 1397 del Código Civil, como término de duración del derecho a falta de pacto expreso, en el supuesto de haberse convenido legalmente el derecho de retracto, habían expirado el 20 de diciembre de 1959, unos tres años antes de solicitarse la inscripción del documento en el registro, lo que significa que de inscribirse como tal pacto de retro, se hubiera inscrito un derecho caducado, inexistente jurídicamente entonces.

## VIII

■ En ninguna de nuestras decisiones se ha decretado el "repudio total" de las prohibiciones de enajenar, como afirma el recurrido a la pág. 9 de su alegato. Si en *Van Syckel*, supra, o en *Luiña*, supra, dijimos que los pactos en ellos envueltos no eran inscribibles, o debían estimarse como no puestos, se debió a que, bajo las particulares circunstancias en ellos concurrentes, las prohibiciones de disponer envueltas no respondían, como expusimos a la pág. 530, a un interés jurídico, a una causa o razón justificada o a una finalidad apreciable. Pero si tal cosa decretamos, incurrimos en una infracción de los artículos de nuestra Ley Hipotecaria y de su Reglamento que permiten el acceso registral a pactos lícitos que modifiquen, limiten o restrinjan derechos reales.

El término "inoficioso", repetimos, lo usamos como sinónimo de innecesario, al igual que lo usamos en *Pueblo* v. *Ortiz Díaz*, 95 D.P.R. 244 (Santana Becerra) (1967) al decir, entre otras cosas: "Convenimos con la Sala sentenciadora que en las circunstancias de este caso *era innecesario e inoficioso* volver a los procedimientos preliminares . . . ."

Los dos pactos de la cláusula QUINTA no surten un mismo efecto, ni uno excluye al otro, ni ambos se predican en idénticos supuestos, por lo que la inscripción de uno no hace innecesaria o inoficiosa la del otro.

Afirmando que modernamente ha predominado el sentido finalista y realista prescindiendo de razonamientos conceptuales Vallet de Goytisolo en su artículo *Determinación de los Derechos*, publicado en el tomo 34, 1961, pág. 164, de la Revista Crítica de Derecho Inmobiliario, apunta:

"Con este mismo buen criterio se ha apreciado y se aprecia también, algunas veces, la inseparabilidad en un título inscribible de los elementos reales y algunos pactos obligacionales que con aquéllos integran un todo unitario. Así, la sentencia del Tribunal Supremo de 27 de junio de 1955 declaró que la cláusula penal establecida en el título constitutivo de una servidumbre voluntaria *in non faciendo*, para el caso de que el titular del predio sirviente contraviniere lo pactado, implica una estipulación accesoria de la servidumbre, inseparable de ella, que una vez inscrita en el Registro, afecta a cualquier adquirente del predio sirviente al que obligaría si cometiera la infracción.

Con igual buen criterio se inscriben sin discriminación los estatutos de comunidades de casas por pisos, en los que hay pactos relativos a la distribución de gastos y a determinadas prohibiciones de carácter obligatorio, pero que son inescindibles de la relación de comunidad. Igual ocurre, sin duda, con los reglamentos de comunidades de aguas, y en general con casi todas las comunidades, o con aquellas servidumbres que requieren para su uso el cumplimiento de determinados deberes de conservación por parte del dueño del predio sirviente."

En la orientadora opinión de *Ortiz* v. *Registrador*, 82 D.P.R. 501, 505, 507 (Blanco Lugo) (1961) ordenamos la cancelación de cierta condición impuesta por unos donantes en una donación de inmuebles a favor de varios hermanos en el sentido de "preferirse mutuamente los condueños en caso de venta o gravamen de sus respectivas participaciones a menos que ninguno de estos esté interesado en tal compra o gravamen."

Entre otras cosas resolvimos en ese recurso:

"[2, 3] Ahora bien, como indica el hipotecarista don Jerónimo González, 'existe un grupo de figuras jurídicas de tipo indiferenciado, las cuales, deberán ser arrastradas al campo obli-

gacional o al de los derechos reales.' Esta posición parte del supuesto—ya aceptado en Puerto Rico en el mencionado caso de *Baldrich,* supra—de que 'la legislación vigente no contiene una categoría agotadora de derechos reales, pudiendo los interesados regular otros de igual naturaleza que los enumerados por la ley, y *modificar desde luego o en lo futuro algunas de las facultades del dominio'.* No puede ignorarse la existencia de ciertos derechos que, dependiendo de su configuración, participen de naturaleza real o personal. Es lo que se ha denominado 'zonas intermedias de interferencia o de claroscuro jurídico, en que lo personal se filtra sutilmente, como una fosforescencia, a través de lo real, o en que lo real refuerza con su potencialidad *erga omnes* los vínculos obligatorios'. Entre estos derechos se encuentra el de tanteo.

◾ Por otro lado, considerada dicha cláusula como una condición limitativa de *ius disponendi* en el inmueble, tampoco se justifica su supervivencia registral, una vez desaparecido el estado de indivisión o comunidad de bienes, que le dio aliento. Como podrá verse, los donantes simplemente establecieron una preferencia recíproca entre los condueños en caso de venta o gravamen de participaciones, con el propósito de evitar la entrada de extraños en la comunidad que entre los hermanos se creaba en virtud de la donación. Pero terminada la comunidad de bienes en el inmueble que nos ocupa y en los demás que fueron objeto de donación, *desaparece la razón de ser de la preferencia por expresión de voluntad de los únicos interesados.* La renuncia de las partes interesadas a que se refiere la nota denegatoria *sería completamente superflua por la manifestación elocuente de éstas al proceder a dividir la comunidad* y hacerse adjudicaciones específicas en pago de su interés respectivo en todos los bienes poseídos en proindiviso.

Por las razones expuestas se revocará la nota recurrida." (Énfasis suplido.)

Es cierto que los compromisos establecidos por los dos pactos que integran la cláusula QUINTA no aparecen especial y perfectamente configurados como puros derechos reales si tales pactos se enjuician y califican con entera independencia de las demás cláusulas, condiciones y estipulaciones del docu-

mento. No obstante, el Registrador inscribió el segundo, al cual no se refiere el presente recurso. El primero también debe serlo, considerándolo, como dice la recurrente, "en concomitancia con la intención de las partes, fines y propósitos del contrato", y teniendo en cuenta además, que forma parte integrante de una transacción sin fines de lucro y que, realmente, sólo puede tipificarse como una donación.[9]

*Se revocará la nota recurrida en su aspecto negativo y se ordenará la inscripción integral del documento.*

---

[9] En *Torruella* v. *Registrador*, 13 D.P.R. 146 (1907) y *Hernández, Síndico* v. *Registrador*, 55 D.P.R. 119 (1939), consideramos válidas ciertas prohibiciones testamentarias de enajenar y nulos los actos realizados contra ellas.

Véanse los comentarios del profesor Ramírez Pabón, en su obra *Derecho de Propiedad,* 1965, págs. 107–109 y la interesante tesis *Las Limitaciones a la Facultad de Disponer en Nuestro Derecho,* 1967, del Licdo. Carlos Martínez Vélez, fichada en la biblioteca de la Facultad de Derecho, Universidad de Puerto Rico.