JAIME GALLARDO HERNÁNDEZ, demandado y recurrente, *v.* CECILIA PETITON GARCÍA y VISTAS DE TIERRAS NUEVAS, INC., demandantes y recurridas.

*Número:* RE-89-635        *Resuelto:* 30 de noviembre de 1992

*Jorge Luis Ortiz Viera* y *Daniel Pernas Beceiro*, abogados del demandado y recurrente; *Jorge L. Marzán* y *Félix A. Toro, Jr.*, abogados de Cecilia Petiton García, demandante y recurrida; *Raúl Caballero Meléndez*, abogado de Vistas de Tierras Nuevas, Inc., demandante y recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Debemos resolver, en el presente caso, si las partes efectivamente realizaron una compraventa con pacto de retro, según el Art. 1407 del Código Civil, 31 L.P.R.A. sec. 3912, o si en verdad se efectuó un préstamo con garantía hipotecaria, según el Art. 1410 del Código Civil, 31 L.P.R.A. sec. 3915.

I

*Hechos*

La Sra. Cecilia Petiton García advino dueña, mediante permuta, de un predio de terreno ubicado en el barrio Tierras Nuevas Poniente del Municipio de Manatí.([1]) Dicho predio de terreno tiene una cabida superficial de cuarenta mil trescientos cuatro punto veintiséis sesenta y cinco metros cuadrados (40,304.2665 m/c), identificado como Lote

---

([1]) Así consta en la Escritura Núm. 37 sobre Permuta, otorgada el 18 de febrero de 1987 en San Juan, Puerto Rico, ante el notario Raúl Caballero Meléndez.

Uno (R-1), el cual consta debidamente inscrito en el Registro de la Propiedad, Sección de Manatí.

Para completar la permuta acordada entre la señora Petiton García y Vistas de Tierras Nuevas, Inc. (en adelante V.T.N.), estas partes decidieron segregar del Lote R-1 un solar de mil (1,000) metros, el cual se adjudicaría a V.T.N. libre de gravámenes. Este acuerdo se hizo constar en la Escritura Pública Núm. 177 de 2 de julio de 1987, sobre Segregación y Complemento de Permuta con Condición Suspensiva, efectuada ante el notario Raúl Caballero Meléndez. La traslación del dominio del solar quedó sujeta a que la segregación fuera aprobada por la Administración de Reglamentos y Permisos (A.R.Pe).[2]

En la fecha anteriormente señalada y ante el mismo notario, la señora Petiton García también otorgó la Escritura Núm. 178 sobre hipoteca en garantía de pagaré que fue emitido por la suma de veinticinco mil dólares ($25,000), con vencimiento a la presentación. Surge de las determinaciones de hecho del tribunal de instancia que "[l]a emisión del referido pagaré se hizo por doña Cecilia con el propósito de negociarlo y levantar fondos para cubrir ciertas necesidades personales imperiosas. Dicha escritura contenía una cláusula o reserva respecto al compromiso contraído con Tierras Nuevas".

Varios días después de la emisión del pagaré, la señora Petiton García acudió ante el Sr. Jaime Gallardo Hernández, prestamista.[3] Estuvo acompañada por el Sr. Etienne Carmine. Tanto la señora Petiton García como el señor Gallardo Hernández acordaron negociar sujeto a las condiciones fijadas por este último. Entre las condiciones establecidas estaba la de cancelar el pagaré de veinticinco mil

---

[2] La segregación del solar de mil metros cuadrados (1,000 m/c) fue aprobada por la Administración de Reglamentos y Permisos el 19 de abril de 1989.

[3] En las determinaciones de hecho del tribunal de instancia se dice que el Sr. Jaime Gallardo Hernández es un comerciante con amplia experiencia en los negocios de compra y venta de propiedades y concesión de préstamos con garantía.

dólares ($25,000). Acordaron, además, que el señor Gallardo Hernández le entregaría a la señora Petiton García la suma de trece mil dólares ($13,000) y éste recibiría a cambio la suma de dieciocho mil dólares ($18,000) en el término de un (1) año.

El señor Gallardo Hernández retuvo los documentos que llevaba consigo la señora Petiton García y refirió los mismos al notario Ángel Millet Martínez para la preparación de una escritura de compraventa con pacto de retro.

El 14 de agosto de 1987 la señora Petiton García acudió en compañía del señor Carmine a las oficinas del notario Millet Martínez con el fin de culminar la transacción acordada con el señor Gallardo Hernández. Allí se procedió a cancelar el pagaré antes mencionado mediante la Escritura Núm. 82. Asimismo se procedió a preparar la Escritura Núm. 83 sobre compraventa con pacto de retro.[4] Al ser referida la misma para la lectura de la señora Petiton García, ésta inquirió a través de su acompañante sobre la frase "Compraventa con Pacto de Retracto". Aclaró en ese momento la señora Petiton García que la transacción que ella efectuaba con el señor Gallardo Hernández era un préstamo. A esto el notario les explicó que meramente se trataba de una formalidad, que la compraventa con pacto de retro era un préstamo que debía pagar en el término de un (1) año. Así entendido, procedió a firmar la escritura.

Para junio de 1988, el señor Gallardo Hernández dirigió una carta certificada a la señora Petiton García recordándole que estaba ya próximo a vencer el término convenido para el pago de los dieciocho mil dólares ($18,000). Dicha carta, sin embargo, no fue recibida por la señora Petiton García, por lo que la misma fue devuelta al señor Gallardo Hernández.

---

[4] La Escritura Núm. 83 fue presentada e inscrita en el Registro de la Propiedad de Manatí al Folio 52 vuelto del Tomo 339, Finca Núm. 12,949, inscripción quinta, libre de cargos.

A pesar de ello, la señora Petiton García se comunicó con el demandado para solicitarle una prórroga para el pago de los dieciocho mil dólares ($18,000). Alegadamente esta prórroga se solicitó y se concedió antes del vencimiento del término de un (1) año que tenía la señora Petiton García para hacer el pago de la cantidad acordada. Dicha prórroga fue sujeta por un mes al cargo de seiscientos dólares ($600) adicionales.

La señora Petiton García intentó pagarle al señor Gallardo Hernández la suma acordada dentro de la prórroga concedida. No obstante, su gestión no dio fruto. Por tal razón, acudió al Lcdo. Jorge L. Marzán para que éste efectuara la entrega del dinero adeudado y otorgara los documentos de rigor. El licenciado Marzán se comunicó con el señor Gallardo Hernández, pero éste no quiso aceptar el pago. Igualmente lo rechazó cuando el licenciado Marzán se personó de imprevisto a la oficina del señor Gallardo Hernández.

Ante tal situación, la señora Petiton García presentó demanda en el Tribunal Superior, Sala de Arecibo, mediante la cual solicitó que se declarase nulo el contrato realizado el 14 de agosto de 1987, entre ella y el señor Gallardo Hernández, por virtud de la Escritura Núm. 83 otorgada ante el notario Millet Martínez sobre compraventa con pacto de retro. Además, reclamó daños. Alegó en la demanda que el negocio realizado fue de préstamo con hipoteca a ser pagado en el término de un (1) año.

Por otra parte, V.T.N. presentó también demanda de cumplimiento específico de contrato contra el señor Gallardo Hernández y la señora Petiton García. Alegó ser dueña de un predio de terreno que forma parte del inmueble adquirido por el señor Gallardo Hernández mediante la escritura pública de compraventa con pacto de retro. Sostuvo, además, que la transacción efectuada entre el señor Gallardo Hernández y la señora Petiton García fue una de préstamo. Por lo tanto, procedía que se anulara la inscrip-

ción del inmueble a favor del señor Gallardo Hernández en el Registro de la Propiedad, Sección de Manatí, y que se ordenara a la señora Petiton García que otorgara la correspondiente escritura de segregación y traspaso del solar de mil metros cuadrados (1,000 m/c), luego de que se obligue al señor Gallardo Hernández a recibir el pago de la deuda hipotecaria. Ambos casos fueron consolidados.

El señor Gallardo Hernández, por su parte, contestó las demandas. Alegó que la transacción que él realizó con la señora Petiton García no fue de préstamo y sí la indicada en la escritura de compraventa con pacto de retro. Sostuvo, además, que al haber transcurrido el término pactado sin que la señora Petiton García ejercitara su derecho al retracto, la venta quedó consumada. Negó, a su vez, que él le hubiese concedido una prórroga a la señora Petiton García como ella alega en la demanda.

Así las cosas, el señor Gallardo Hernández presentó una moción mediante la cual solicitó que se desestimara y/o se dictara sentencia sumaria a su favor decretando el archivo con perjuicio del caso. Solicitó también la imposición de una suma razonable en honorarios de abogado.

El 15 de mayo de 1989 la parte demandante consignó en la Secretaría del tribunal de instancia la cantidad de dieciocho mil seiscientos dólares (18,600). Esta consignación fue admitida por el tribunal el 18 de mayo de 1989, con la objeción del señor Gallardo Hernández. Dicha cantidad fue retirada por la señora Petiton García mediante solicitud a esos efectos y permitida por el tribunal en virtud de la orden de 6 de julio de 1989.

El 18 de octubre de 1989 el tribunal de instancia dictó sentencia en la cual decretó que el negocio jurídico plasmado en la Escritura Núm. 83 de 14 de agosto de 1987, denominada "Compraventa con Pacto de Retro", otorgada ante el notario Millet Martínez, era en realidad un contrato de préstamo con garantía hipotecaria, puesto que se

cumplían en este caso las tres (3) condiciones o requisitos del Art. 1410 del Código Civil, *supra*. A base de lo anterior, declaró nulo e inexistente el traspaso de la propiedad objeto del litigio y reconoció que la señora Petiton García es la dueña de dicha propiedad. Le ordenó a ésta que devolviera al señor Gallardo Hernández la cantidad de trece mil dólares ($13,000), suma que éste le prestara. No obstante, indicó que de esa suma le corresponde al Estado Libre Asociado de Puerto Rico la cantidad de tres mil doscientos cincuenta dólares ($3,250), porque en el contrato se pactaron intereses usurarios en contravención a lo que dispone la Ley Núm. 82 de 6 de julio de 1985 y el Art. 1652 del Código Civil, 31 L.P.R.A. sec. 4594.

Se ordenó al Registrador de la Propiedad, Sección de Manatí, que procediera a cancelar la inscripción quinta de la finca Núm. 12,949 que aparece anotada al Folio 52 vuelto del Tomo 339 de Manatí, dejando en vigor el título previo de la señora Petiton García.

También se ordenó a la señora Petiton García otorgar la escritura correspondiente de segregación y complemento de permuta sobre el Lote RI-A a favor de V.T.N. Finalmente, se le impuso al demandado el pago de las costas en ambos casos y la suma de tres mil dólares ($3,000) por concepto de honorarios de abogado.

Inconforme con esta determinación, la parte demandada presentó una solicitud de revisión ante nos. Planteó como único señalamiento de error el siguiente:

El Honorable Tribunal de Instancia cometió error de derecho al darle curso a las demandas radicadas y dictar la sentencia objeto del presente recurso, sin que adquiriera previamente jurisdicción sobre la materia, en contravención ello a las disposiciones del artículo 1407 del Código Civil, vigente, según enmendado.

Decidimos revisar y expedimos el auto solicitado.

## II

■ El presente caso requiere que discutamos varios de los artículos referentes al retracto convencional para que determinemos si, a la luz de los hechos, se configuró entre las partes esta obligación o, por el contrario, se pactó algo distinto. Comencemos, pues, haciendo referencia al Art. 1396 del Código Civil, 31 L.P.R.A. sec. 3901, el cual define lo que es el retracto convencional de la manera siguiente:

> Tendrá lugar el retracto convencional cuando el vendedor se reserve el derecho de recuperar la cosa vendida, con obligación de cumplir lo expresado en la sec. 3912 de este título, y lo demás que se hubiese pactado.[5]

■ El Art. 1407 del Código Civil, *supra*, dispone que el vendedor no podrá hacer uso del derecho de retracto a menos que reembolse al comprador el precio de la venta y, además, los gastos del contrato y cualquier otro pago que se considere legítimo para la venta. Además, el vendedor tiene que reembolsar al comprador los gastos necesarios y

---

[5] El equivalente a nuestro Art. 1396 (31 L.P.R.A. sec. 3901) en el Código español es el Art. 1.507. Algunos en España han propuesto la eliminación de esta institución (venta con pacto de retro) porque sostienen que fomenta el desarrollo de la usura.

Sin embargo, otros como Manresa, por ejemplo, sostienen que "más se combate la institución por los abusos a que se puede prestar, que por su bondad o maldad intrínseca, y este criterio no creemos, en verdad, que se pueda citar como modelo de criterio de crítica jurídica". J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1969, T. X, Vol. 1, pág. 431. Atribuye, precisamente, el mal uso que se le da a esta institución a la manera en que las leyes españolas reglamentan la constitución y efectividad del crédito hipotecario. Sostiene que la hipoteca en España es cara y mala y que el "procedimiento ejecutivo aplicado a la misma, en el que se exige hasta el embargo de los bienes especialmente hipotecados, resulta largo y costoso, que la garantía disminuye con esta amplitud y esta difusión de la ley Procesal, y que las gentes, cuando se encuentran que en el molde legal no caben sus aspiraciones, se van procurando otro en donde puedan verse satisfechas". Íd., pág. 432.

Concluye, finalmente, que "[e]l retracto convencional es como el arsénico y, después de todo, como todas las cosas, sirve para matar y para sanar: lo que hay que hacer es reglamentar las condiciones en las cuales sana, e impedir en lo posible aquellas otras en las que mata. A más no se puede llegar. La posibilidad de abuso no es peculiar de esta institución; es común a todas". Manresa, *op. cit.*, págs. 432–433.

útiles hechos en la cosa vendida. A su vez, el párrafo final de dicho artículo dispone:

> *Para que pueda darse curso a las demandas de retracto se requiere que se consigne el precio* si es conocido, o si no lo fuere, que se dé fianza de consignarlo luego que lo sea. (Énfasis suplido.) 31 L.P.R.A. sec. 3912.

La Ley Núm. 71 de 27 de mayo de 1980 nos indica en su exposición de motivos que la Ley de Enjuiciamiento Civil que rigió en Puerto Rico a partir de 1886 no ha sido derogada en cuanto al requisito que se exige para ejercitar la acción de retracto. 1980 Leyes de Puerto Rico 187. Allí claramente se dice que el retrayente debe consignar el precio y que este requisito o disposición es de carácter sustantivo. A pesar de que las Reglas de Procedimiento Civil de 1979 derogaron la Ley de Enjuiciamiento Civil de 1885, esta disposición sustantiva se mantuvo provisionalmente vigente hasta tanto se incorporó dicha disposición al Código Civil, mediante la Ley Núm. 71, *supra*, la cual enmendó el citado Art. 1407 a los efectos de añadir el párrafo antes citado. Por ello, en *Zalduondo v. Iturregui*, 83 D.P.R. 1, 10–11 (1961), se dijo refiriéndose al Art. 1616(2) de la antigua Ley de Enjuiciamiento Civil que:

> Claramente nos indica ese artículo que la única suma que está obligado a consignar el comunero retrayente para cursarse su demanda de retracto es el precio de la primera venta que originó la retroacción y ninguna otra suma. *Es obvio que la exigencia de la consignación simultánea y efectiva del precio de venta con la presentación de la demanda de retracto*, o en su caso la de dar fianza, no se hace extensiva en forma alguna a las otras sumas adicionales que por mandato expreso del artículo 1407 de nuestro Código Civil viene obligado el retrayente a "reembolsar al comprador", y que son: "los gastos del contrato, y cualquier pago legítimo hecho para la venta" y los "gastos necesarios y útiles hechos en la cosa vendida". (Énfasis suplido.)

El carácter sustantivo de la disposición antes aludida tiene su fundamento en que "el retracto, por su natu-

raleza privilegiada, limitativa de la facultad dispositiva del comprador y que algunas veces se considera como un instituto perturbador de la libre contratación, no es un derecho absoluto que pueda desligarse de su ejercicio, sino que, por el contrario, se subordina a éste, haciendo depender su efectividad de la circunstancia especial de que llegue a reclamarse en forma y cumpliéndose con las condiciones esenciales del derecho de retracto ...". *Zalduondo v. Iturregui*, supra, pág. 20.

No hay entonces la menor duda de que a base de la letra del Art. 1407 del Código Civil, *supra*, y lo dicho por este Tribunal anteriormente, es indispensable que al presentarse una demanda de retracto se consigne a la vez el precio de venta. Es importante señalar que si las partes no han acordado término alguno de duración, el retracto durará por el término de cuatro (4) años, contados desde la fecha del contrato. En caso de que las partes estipulen un plazo, éste no puede exceder de diez (10) años. Art. 1397 del Código Civil, 31 L.P.R.A. sec. 3902.

Ahora bien, en el presente caso la parte demandante sostuvo que la transacción efectuada con el señor Gallardo Hernández fue de préstamo y que aplicaban las disposiciones del Art. 1410, *supra*, el cual dispone:

> Toda venta de propiedad inmueble con pacto de retroventa se presumirá que constituye un contrato de préstamo por el montante del precio, con garantía hipotecaria de la finca vendida, en cualquiera de los casos siguientes:
> Primero: Cuando el comprador no hubiere entrado en posesión material de la cosa vendida.
> Segundo: Cuando el vendedor pague interés al comprador por el precio de la venta, aunque se denomine canon de arrendamiento o se le dé otro nombre cualquiera.
> Tercero: Cuando se hiciere figurar en el contrato, como precio de enajenación, una cantidad enteramente inadecuada.

Cabe señalar que este artículo es autóctono y que no

tiene precedente alguno en los códigos españoles. El mismo, de acuerdo con el profesor Vélez Torres, es la respuesta puertorriqueña a un problema que nos aquejó en las primeras décadas del presente siglo. J.R. Vélez Torres, *Contratos: Contratos Nominados*, Facultad de Derecho de la U.I.A., 1987, Parte II, Cap. V, Comenta el profesor Vélez Torres, *op. cit.*, págs. 284–285, lo siguiente:

> Resulta que los campesinos puertorriqueños, dueños de pequeñas parcelas de terreno de las cuales extraen el sustento de ellos y de sus familias, necesitaron, un día, el financiamiento que les permitiera dedicar sus terrenos a siembras que ellos consideraron más productivas. Pero como su título de propiedad nunca ganó acceso al Registro de la Propiedad, sino que siempre se desenvolvió a espaldas de éste, cuando quisieron dar sus tierras en garantía de los préstamos que necesitaban con suma urgencia, no pudieron hacerlo por la circunstancia de que la garantía que representaba la hipoteca sobre el inmueble no podía nacer como derecho real, porque no se podía inscribir. Entonces los prestamistas, muchos de ellos interesados en el título de propiedad de los terrenos envueltos en cada transacción, acudían a sus abogados y, éstos, siempre hábiles en esto de extraer soluciones de la normativa vigente, echaron mano a la figura del retracto convencional. Y fueron muchas las transacciones que con el nombre de "compraventa con pacto de retro" o, simplemente, "retroventa", llenaron los protocolos de los notarios de aquella época. Con esta práctica, que se generalizó en toda la Isla, nuestros campesinos pusieron en manos de los prestamistas de los pueblos, muchos de ellos inescrupulosos, el futuro económico de ellos y el de su familia. Años después, empezó a manifestarse la mano insensible y egoísta del Shylock tropical.
>
> Por esta vía, muchos campesinos puertorriqueños fueron víctimas del despojo que propiciaba el recurso de la venta con pacto de retracto, usado indebidamente para encubrir verdaderos préstamos personales, muchas veces usurarios.

¿Cuál es entonces la procedencia del Art. 1410 del Código Civil, *supra*? Procede de la Ley Núm. 47 de 13 de abril de 1916, la cual se aprobó con el fin de atajar el

grave e imperdonable problema de la usura.(6) En otras palabras, este artículo se aprobó para, en casos de que un propietario tuviera la necesidad imperiosa de obtener un préstamo y acudiera a un prestamista dando en garantía la propiedad, el mero transcurso del plazo acordado entre ambos para pagar lo adeudado, no pondría a operar el Art. 1407 del Código Civil, *supra*, puesto que no se estaría ante un retracto convencional, sino ante un préstamo. Ello siempre y cuando se dé al menos uno de los requisitos del citado Art. 1410. De esta manera se evitaba el despojo del propietario. Es interesante destacar que en la segunda mitad del siglo XIX muchos pequeños caficultores de la región de Utuado perdieron sus tierras mediante la transacción conocida como "venta con pacto de retro". Nos comenta el profesor Fernando Picó lo siguiente:

> Esto hace que el fulcro de las relaciones entre prestamista y caficultor sea la tierra misma; la tierra es la prenda perenne de las obligaciones. Su valor representa el límite de los créditos posibles. Su porción cultivada es la parte preferida de las ejecuciones hipotecarias. El control que el refaccionista logra sobre la tierra le da poderes, no sólo sobre la cosecha sino también sobre todas las actividades económicas del caficultor. En su forma más burda —en la venta con pacto de retroventa, que se practica hasta la década del 1870— el caficultor se convierte, virtualmente, en arrendatario de su propia tierra. Es como un aparcero que tiene un título precario sobre el suelo que cultiva, y que vive en perpetua agonía por cumplir con unos plazos, que podrían resultar académicos ante cualquier capricho climatológico o vaivén de los precios mundiales. F. Picó, *Amargo Café*, Río Piedras, Eds. Huracán, 1981, págs. 78–79.

Teniendo en mente lo anterior, veamos si en el caso de autos está al menos presente uno de los requisitos del ci-

---

(6) En *Iglesia Católica v. Registrador*, 96 D.P.R. 511 (1968), se dice que con la aprobación de la Ley Núm. 47 de 13 de abril de 1916 se le dio un duro golpe a los prestamistas usureros. Además, se destaca el hecho de que a partir de dicha legislación la institución del retracto convencional prácticamente cayó aquí en desuso. "La gran mayoría de nuestras decisiones, desde *Lizardi v. Registrador*, 24 D.P.R. 863 (Hernández) (1917) hasta *Shivell v. Barber y Boscio*, 92 D.P.R. 400 (Rigau) (1965), unos 57 casos, versan sobre el retracto legal". Íd., pág. 542 esc. 8.

tado Art. 1410.([7]) De entrada, una simple lectura de la Escritura Núm. 83, denominada "Compraventa con Pacto de Retro" de 14 de agosto de 1987 y otorgada entre la señora Petiton García y el señor Gallardo Hernández, nos hace sospechar que en este caso se pactaron intereses, aunque no se le dio tal nombre. La cláusula quinta de dicha escritura dispone:

> Quinto: Se pacta el precio de retroventa en DIECIOCHO MIL DOLARES ($18,000.00) debido a que en el área donde se encuentra ubicada la propiedad objeto de este contrato se proyecta un aumento sustancial en la plusvalía de los terrenos, que las partes estiman un crecimiento de valor de aproximadamente CINCO MIL DOLARES ($5,000.00) por sobre el precio acordado en el día de Hoy.

El tribunal de instancia determinó correctamente que la cláusula citada anteriormente lo que pretendía era disfrazar el cobro de intereses mediante el supuesto aumento en valor que evidenciaría la propiedad, hecho incierto. En otras palabras, si las partes acordaron que la demandante recibiría trece mil dólares ($13,000) y pagaría dieciocho mil dólares ($18,000) al término de un (1) año, estaría pagando la cantidad de cinco mil dólares ($5,000) en exceso de lo recibido. Como correctamente se dice en la sentencia, "[u]na simple operación matemática nos lleva a concluir que el interés aplicado asciende a 38.5% lo que excede al máximo legal ...". Sin embargo, en dicha sentencia se hace referencia incorrectamente a la Ley Núm. 82 de 6 de julio de 1985 que fijaba el interés legal en doce por ciento (12%)

---

([7]) El profesor Vélez Torres nos advierte lo siguiente refiriéndose al Art. 1410 (31 L.P.R.A. sec. 3915):

"Sabido es que la inscripción del derecho real de hipoteca es constitutivo de derechos, de suerte que nunca puede considerarse 'préstamo con garantía hipotecaria' una transacción de préstamo destinada a desenvolverse fuera del Registro de la Propiedad." J.R. Vélez Torres, *Contratos: Contratos Nominados*, Facultad de Derecho U.I.A., 1987, Parte II, Cap. V, págs. 283–284.

En todo caso estaríamos ante un préstamo con una garantía real, pero no hipotecaria.

54

anual. Es importante señalar que el interés legal al que se refiere la Ley Núm. 82, *supra*, es el interés legal por sentencia.([8])

■ En este caso los intereses usurarios fueron parte del convenio pactado entre las partes. En cuanto a estos intereses que surgen por convenio especial de las partes, rige lo dispuesto en el Art. 1649 del Código Civil, 31 L.P.R.A. sec. 4591:

> A falta de un contrato previo escrito, el tipo de interés sobre préstamos o prórrogas de dinero o mercancías o sobre cualquier clase de obligación o contrato será de seis (6) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, y al mismo tipo por una suma mayor o menor, o por un período más largo o más corto; Disponiéndose, sin embargo, que no podrá fijarse un tipo de interés, por convenio especial, que sea mayor de nueve (9) dólares anuales sobre cada cien (100) dólares o sobre su equivalente en valor, cuando el capital objeto del préstamo o del convenio no exceda de $3,000 y de ocho (8) dólares anuales por cada cien (100) dólares, cuando pase de dicha cantidad. Dentro de los límites que por este título se fijan, será legal descontar letras y pagarés y otras obligaciones análogas.

De manera que a base del citado Art. 1649, solamente se hubiera podido pactar intereses al ocho por ciento (8%), puesto que el convenio excede de tres mil dólares ($3,000). En este caso se pactaron intereses al treinta y ocho punto cinco por ciento (38.5%).

■ Debemos recordar que el Art. 1652 del Código Civil, *supra*, dispone en su parte pertinente que:

> Ningún contrato en el cual se reserve, acepte o asegure, o se convenga en reserva, aceptar o asegurar, un tipo de interés mayor que el que se permite por [este capítulo], podrá hacerse

---

([8]) La Ley Núm. 82 de 6 de julio de 1985 enmendó la Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Posteriormente, se volvió a enmendar dicha regla por la Ley Núm. 78 de 11 de julio de 1988 a los fines de establecer que el interés a pagarse sobre la cuantía de una sentencia será el que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras y esté en vigor al momento de dictarse la sentencia.

efectivo en una corte de Puerto Rico, sino por el importe del capital adeudado; y [la corte] deberá, además, disponer en la sentencia condenando al deudor al pago del capital que el acreedor recobre solamente de su deudor el setenta y cinco (75) por ciento de dicho capital y que el veinticinco (25) por ciento restante sea adjudicado y recobrado por el Estado Libre Asociado de Puerto Rico, quien podrá obtener mandamiento de ejecución, del mismo modo que el demandante, y sin preferencia sobre el montante adjudicado a éste, para hacer efectivo el veinticinco (25) por ciento así adjudicado. Véase *J.E. Candal & Co. v. Rivera*, 86 D.P.R. 508 (1962).

■■ Los derechos establecidos en esta sección no son renunciables. *Smith v. Negrón*, 54 D.P.R. 401 (1939).

En cuanto al requisito de que el comprador no haya entrado en posesión del inmueble, Art. 1410, *supra*, el tribunal de instancia concluyó que aunque el demandado visitó el barrio Tierras Nuevas Poniente donde ubica el inmueble objeto de la controversia, no pudo localizarlo. Tampoco lo logró cuando en una segunda ocasión visitó el lugar. De manera que "[c]omo cuestión de realidad nunca entró en posesión del inmueble ni conoció la propiedad. Así lo demuestra el hecho incontrovertido de que confundió el inmueble al tratar de mostrarlo a su propio tasador, señor Orlando Flores en ocasión de éste visitarlo para fines de preparar un informe de tasación". Véase *Rodríguez v. Rivera*, 71 D.P.R. 290, 293 (1950).

Con respecto a si el precio de venta del inmueble es inadecuado, el tribunal de instancia concluye lo siguiente:

El inmueble en controversia constituye parte de una finca de treinta y nueve (39) cuerdas que está desarrollada casi en su totalidad en predios con cabida desde 1000 metros cuadrados cuyo precio de venta se ha realizado a razón de $15.00 por metro cuadrado y han sido objeto de edificaciones para vivienda de gran valor económico. Obra en autos abundante prueba documental, no controvertida, en apoyo de esta determinación.

El predio, aunque inferior en topografía, goza de acceso a agua potable, energía eléctrica, teléfono y escuelas.

Está próximo a la carretera número dos (2), a la ciudad, a la zona playera y contiguo a un desarrollo de clase media alta por

lo que su potencial económico es evidente. El perito tasador don Juan Dávila de Jesús, declarando como perito de la demandante así lo atestó confiriéndole un valor conservador de $107,500.00. *Damos entero crédito a su testimonio.* (Énfasis suplido.)

A nuestro juicio, el comprador no derrotó la presunción *juris tantum* que establece el Art. 1410 del Código Civil, *supra*, a favor del vendedor. *Marcano v. Registrador*, 41 D.P.R. 542, 545 (1930). En el caso de autos, además de otro tipo de prueba, hubo también el testimonio de peritos. Sobre este particular hemos sostenido que "los tribunales de instancia, como este Tribunal en ejercicio de su facultad revisadora, tienen amplia discreción en la apreciación de la prueba pericial pudiendo, aun, adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta". *Valldejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917, 921 (1971). No encontramos razón alguna para descartar el testimonio del perito de la parte demandante, el cual creyó el foro de instancia.

En cuanto a los otros testimonios presentados por la parte demandante, éstos le merecieron entera credibilidad al juzgador de los hechos, por lo tanto, no intervendremos con dicha apreciación de la prueba en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987).

En virtud de lo anteriormente expuesto, *se dictará sentencia confirmando en parte y modificando en cuanto a los intereses legales la emitida por el Tribunal Superior, Sala de Arecibo, el 18 de octubre de 1989.*

El Juez Asociado Señor Negrón García emitió una opinión concurrente.

— O —

Opinión concurrente del Juez Asociado Señor Negrón
García.

I

Cecilia Petiton García permutó con Vistas de Tierras
Nuevas, Inc. (en adelante Vistas) un terreno. Acordaron
segregarlo y complementar la permuta adjudicándole a
Vistas cierto lote. Petiton García otorgó escritura de hipo-
teca en garantía de pagaré, la cual contenía una cláusula
sobre dicho compromiso. El pagaré fue negociado al comer-
ciante Jaime Gallardo Hernández y cancelado
posteriormente.

Gallardo Hernández acordó con Petiton García entre-
garle $13,000, a cambio de lo cual al año recibiría $18,000.
El 14 de agosto de 1987 se otorgó la Escritura Núm. 83
sobre compraventa con pacto de retro, subsiguientemente
inscrita en el Registro de la Propiedad de Manatí.

Petiton García solicitó, y obtuvo de Gallardo Hernán-
dez, una prórroga antes del vencimiento del término
acordado. La prórroga de un (1) mes estaría sujeta al pago
de $600 adicionales. Aunque ella intentó pagarle a tiempo,
Gallardo Hernández rehusó aceptar el pago. Entonces, Pe-
titon García solicitó la nulidad del contrato de compra-
venta con pacto de retro ante el Tribunal Superior, Sala de
Arecibo. A la vez, Vistas pidió su cumplimiento específico y
alegó que esa compraventa con pacto de retro realmente
era un préstamo. Ambos casos fueron consolidados.

Oportunamente, dicho foro concluyó en la afirmativa,
esto es, que la compraventa con pacto de retro era un prés-
tamo con garantía hipotecaria. La anuló en virtud del Art.
1410 del Código Civil, 31 L.P.R.A. sec. 3915. En consecuen-
cia, ordenó la devolución a Gallardo Hernández de los

$13,000, menos $3,250 para el Estado Libre Asociado por concepto de intereses usurarios. También dispuso la cancelación en el Registro de la Propiedad de la inscripción de la escritura de compraventa, más el pago de costas y honorarios de abogado. Gallardo Hernández recurrió.

## II

Al confirmar la sentencia del ilustrado foro de instancia, la opinión mayoritaria expone:

> De entrada, *una simple lectura* de la Escritura Núm. 83, denominada "Compraventa con Pacto de Retro" de 14 de agosto de 1987 y otorgada entre la señora Petiton García y el señor Gallardo Hernández, *nos hace sospechar que en este caso se pactaron intereses, aunque no se le dio tal nombre.* La cláusula quinta de dicha escritura dispone:
> "Quinto: Se pacta el precio de retroventa en DIECIOCHO MIL DOLARES ($18,000.00) debido a que en el área donde se encuentra ubicada la propiedad objeto de este contrato se proyecta un aumento sustancial en la plusvalía de los terrenos, que las partes estiman un crecimiento de valor de aproximadamente Cinco Mil Dolares ($5,000.00) por sobre el precio acordado en el día de Hoy."
> El tribunal de instancia determinó correctamente que la cláusula citada anteriormente lo que pretendía era *disfrazar* el cobro de intereses mediante el supuesto aumento en valor que evidenciaría la propiedad, hecho incierto. (Énfasis suplido.) Opinión mayoritaria, pág. 53.

Coincidimos en que el Art. 1410 del Código Civil, *supra*, crea la presunción legal de que una retroventa se presumirá préstamo con garantía hipotecaria si se da alguna de las circunstancias siguientes: (1) que el comprador no entre en la posesión física de la cosa vendida; (2) *que el vendedor pague intereses al comprador por el precio de la venta, aunque se denomine canon de arrendamiento o se le dé otro nombre cualquiera*, y (3) que el precio contractual por la enajenación sea inadecuado. Aunque nuestro citado Art. 1410 no tiene precedente en España, las disposiciones

que rigen la figura de venta con pacto de retro tienen su equivalente en el Art. 1.507 del Código Civil español. Obligatorio es, pues, examinarlo.

A su amparo, la doctrina permite que en la compraventa con pacto de retro se pacten *variaciones* en el precio de la venta.([1]) En consecuencia, cuando el precio pagado inicialmente sea diferente del pagado para retrotraer, ello *no significa necesariamente que se haya pactado el pago de intereses.* La *Nueva Enciclopedia Jurídica* nos ilustra:

> En cuanto al precio de la venta, que necesariamente ha de reembolsarse éste antes del vencimiento del plazo estipulado, o consignarlo, si al ofrecimiento de pago siguió la negativa del obligado (2 diciembre 1914). Ese precio ¿habrá de ser necesariamente el mismo que aquel por el que se efectuó la venta? Los romanistas entendieron que el mentado precio podía cambiar en más o en menos; y así lo entendió también el Derecho canónico y la legislación de Partidas. Nuestro Código [Español] habla del "precio de la venta", por lo que parece inferirse que ha de ser el mismo; pero algunos comentaristas, como MANRESA, y escritores, como SERRANO, admiten la licitud del pacto por el que se debe retraer en cantidad mayor. La Jurisprudencia tiene declarado que el convenio por el cual se aumenta o disminuye el precio fijado en el contrato anterior de venta con pacto *de retro* entraña una novación esencial del mismo (4 enero 1890), pero que si se hizo constar en la inscripción registral el precio de venta, a éste hay que atender, y no al que, aumentado, se hace figurar en una adición al contrato (3 julio 1906; Cfr. sentencia de 30 de marzo 1909). (Énfasis en el original y escolio omitido.) *Nueva Encidopedia Jurídica*, Barcelona, Ed. Francisco Seix, 1968, T. IV, pág. 533.

Es evidente, pues, que cabe la diferencia entre la compraventa con pacto de retro, en la que se pactan variaciones en precio de venta (el acuerdo por el cual la persona que compra y adviene propietario de un inmueble y se compromete a venderla a su vendedor, dentro de un término

---

([1]) Varios tratadistas acogen esta idea. J. Castán Tobeñas, *Derecho Civil español común y foral*, 6ta ed. rev., Madrid, Ed. Reus, 1944, T. III, pág. 59 esc. 1; F. Puig Peña, *Tratado de Derecho Civil Español*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1973, pág. 161.

fijo de tiempo, por un precio mayor o distinto que el original) y el acuerdo por el cual una parte se compromete a pagar intereses sobre determinada cantidad de dinero, llámesele a éste "precio" o de otra forma. La opinión mayoritaria da a entender que toda diferencia en precio en compraventa con pacto de retro equivale a un pacto de pago de intereses. No creemos que esa conclusión sea inescapable.

### III

Para que surja la presunción del citado Art. 1410 del Código Civil, basta que concurra una sola de las condiciones allí enumeradas. Como correctamente resuelven, aquí existen dos (2): (1) el comprador no entró en posesión del bien comprado y (2) en el contrato de compraventa con pacto de retro se hizo figurar una cantidad inadecuada como precio de enajenación. Claramente, el negocio jurídico realizado quedó cubierto por dicha presunción. Como no fue rebatida por Gallardo Hernández, se convirtió en un préstamo con garantía hipotecaria. Una vez determinado que el negocio fue un préstamo y no una compraventa, la diferencia en precio equivale a un interés.

Como señalan Pérez González y Alguer, el Código Civil español no contiene definición alguna del concepto interés. L. Enneccerus y H. Lehmann, *Tratado de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1955, T. II. Tampoco nuestro Código Civil. En los campos de lo económico y de lo jurídico se han ofrecido varias definiciones del concepto. Barré lo define como " 'el precio pagado en dinero por el uso del propio dinero' ". *Economía política*, trad. de García Lomas, t. II, págs. 115–118, en *Nueva Enciclopedia Jurídica, op. cit.*, T. XIII, pág. 216. Von Stackelberg lo define como "la renta procedente de la posesión del capital, y su explicación sería análoga (nunca idéntica) a la de la renta de la tierra concebida como ingreso neto procedente de ésta y a la del salario como remuneración del trabajo". *Principios de teoría económica*, pág. 293 y ss, en *Nueva Encidopedia*

*Jurídica, op. cit.*, T. XIII, pág. 216. Por su parte, Pérez González y Alguer definen el interés como " 'el rédito que produce el dinero en relación a la cantidad a que asciende y al tiempo que se desplaza de la utilización de su titular', distinguiéndolo de la renta porque ésta no presupone una obligación de capital y de la amortización porque sólo representa un pago parcial de aquél". Enneccerus-Lehmann, *Tratado de Derecho civil*, t. II–1, págs. 55 a 61, en *Nueva Encidopedia Jurídica, op. cit.*, T. XIII, pág. 216. *El Diccionario de Derecho Civil* lo define como "las cantidades de dinero a satisfacer por la utilización de un capital dinerario". M.A. del Arco y M. Pons González, *Diccionario de Derecho Civil*, Navarra, Ed. Aranzadi, 1984, T. II, pág. 85. *En términos generales, podríamos decir que el interés es el precio que se paga por el uso del dinero. De ordinario, ese precio consiste en la diferencia entre la cantidad que se recibe en préstamo y la cantidad que se debe devolver.*

Establecido que se pactó el pago de intereses, nos unimos al análisis mayoritario de que eran usurarios.